**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CJ HOLDING CO., *et al.*,[1] | § | Case No. 16-33590 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

**EMERGENCY MOTION OF CJ HOLDING CO.,**
***ET AL.*, FOR ENTRY OF INTERIM AND FINAL ORDERS**
**AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION**
**WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE**
**EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS**

**THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER FOR <u>JULY 21, 2016 AT 2:00 PM (CT)</u> BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), are: CJ Holding Co. (4586); Blue Ribbon Technology Inc. (6338); C&J Corporate Services (Bermuda) Ltd.; C&J Energy Production Services-Canada Ltd.; C&J Energy Services, Inc. (3219); C&J Energy Services Ltd.; C&J Spec-Rent Services, Inc. (0712); C&J VLC, LLC (9989); C&J Well Services Inc. (5684); ESP Completion Technologies LLC (4615); KVS Transportation, Inc. (2415); Mobile Data Technologies Ltd.; Tellus Oilfield Inc. (2657); Tiger Cased Hole Services Inc. (7783); and Total E&S, Inc. (5351). The location of the Debtors' service address is 3990 Rogerdale, Houston, Texas 77042.

CJ Holding Co. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),[2] respectfully state the following in support of this motion (this "Motion"):

## Relief Requested

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"): (a) authorizing the Debtors to: (i) pay certain prepetition wages, salaries, reimbursable employee expenses, and other compensation described below; (ii) pay and honor employee medical and similar benefits; (iii) continue employee compensation and employee benefit programs in the ordinary course of business on a postpetition basis in a manner consistent with prepetition practices; and (iv) continue employee incentive programs for non-insiders; and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of the Bankruptcy Code, rules 6003 and 6004 of the Federal Rules of Bankruptcy

---

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Mark Cashiola in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on July 20, 2016 (the "Petition Date"). Capitalized terms used, but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

Procedure (the "Bankruptcy Rules"), and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

**The Debtors' Workforce**

5. The Debtors employ approximately 4,977 individuals (collectively, the "Employees"). Approximately 3,464 Employees are paid on an hourly basis and approximately 1,513 Employees are salaried. Additionally, approximately 319 of the Employees are located in Canada (the "Canadian Employees") and employed by Debtors Mobile Data Technologies Ltd. (the "MDT Employees") or C&J Production Services—Canada Ltd. (the "CJPS Employees"), while the remaining 4,658 Employees are located in the United States and employed by the various domestic Debtors (the "U.S. Employees"). None of the Employees are represented by a union or collective bargaining unit. The Employees perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' restructuring. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Debtors' Employees include highly trained personnel who are not easily replaced. Without the continued, uninterrupted services of their Employees, the Debtors' restructuring efforts will be halted.

6. The vast majority of employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families. Thus, employees will be exposed to significant financial hardships if the Debtors are not permitted to continue paying their compensation, providing benefits, and maintaining existing programs. Consequently, the relief requested is necessary and appropriate.

## Employee Compensation and Benefits

7. The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected. The Debtors are seeking authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, and other related obligations and health and welfare benefits that the Debtors have historically provided to their Employees (collectively, the "Employee Compensation and Benefits"). The Debtors also seek to pay all costs incident to the Employee Compensation and Benefits.

8. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business on a postpetition basis and to pay prepetition amounts related thereto. To the extent applicable, the Debtors also request authority to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

### I. Compensation and Withholding Obligations.

#### A. Employee Compensation.

9. The Debtors pay their Employees' wage and salary obligations (collectively, the "Employee Compensation") biweekly on either a salaried or hourly basis. Employee Compensation is paid in arrears for work performed during a given 14-day period. Oftentimes, a percentage of revenue or a day rate is included as part of the routine compensation for field workers employed by Debtor C&J Wells Services, Inc. or Debtor ESP Completion Technologies LLC. This compensation structure is consistent with industry standards for field workers employed in the oil and gas space.

10. On average, the Debtors' biweekly gross payroll expenses, including all Wages, is approximately $16,223,000.[3] As of the Petition Date, the Debtors believe that, approximately $14,753,000 of prepetition wages, salaries, overtime, and other compensation, excluding reimbursable expenses, paid time off, and amounts related to the Debtors' Retirement Plans (as defined herein), is accrued and outstanding (collectively, the "Unpaid Wages"), of which $14,753,000 will become due and owing in the first 30 days of these chapter 11 cases. The Debtors do not believe that any of the Unpaid Compensation will exceed the $12,850 priority cap in place under subsections (a)(4) and (a)(5) of section 507 of the Bankruptcy Code with respect to any individual Employee.[4] By this Motion, the Debtors request authority to continuing paying the Unpaid Compensation in the ordinary course of business, including payment of certain prepetition obligations related thereto.

**B. Staffing Provider Workers.**

11. Additionally, the Debtors utilize the services of approximately 54 temporary workers (collectively, the "Staffing Provider Workers") through a number of different vendors (collectively, the "Staffing Providers"). The Staffing Provider Workers fill a variety of roles for the Debtors including file clerk, accountant, accounts payable clerk, and other information technology and programming services. Generally, the Staffing Providers pay the Staffing Provider Workers directly for their services and then invoice the Debtors for such amounts. The Debtors, in turn, pay the Staffing Providers. All the Staffing Provider Workers are at will

---

[3] This amount includes automobile allowances to approximately 100 Employees ranging from $350 to $450 per pay period. On average, the Debtors pay approximately $97,250 per month on account of the automobile allowances.

[4] Nine of the Employees have accrued vacation in amounts exceeding the $12,850 priority cap that will become due and owing upon termination. By this Motion the Debtors do not seek authority to pay any such Employees in amounts exceeding the $12,850 priority cap in the event they are terminated during the pendency of these chapter 11 cases.

employees and may be terminated by the Debtors at any time. On average, the Debtors pay approximately $510,000 per month on account of the Staffing Provider Workers, including administrative and agency fees. As of the Petition Date, the Debtors estimate that approximately $820,000 is accrued and outstanding on account of the Staffing Provider Workers, of which $510,000 will become due and owing within the first 30 days of these chapter 11 cases.

**C. Independent Contractors.**

12. Through various contracts, approximately 22 independent and small contractors (collectively, the "Independent Contractors") conduct a range of important services for the Debtors, including accounting engineering, sales, and directional drilling. The Debtors typically remit payment for the Independent Contractors' services directly to the Independent Contractors through their accounts payable system. On average, the Debtors pay approximately $371,000 per month on account of compensation owed to the Independent Contractors. As of the Petition Date, the Debtors estimate that approximately $722,000 is accrued and outstanding on account of the Independent Contractors, of which $371,000 will become due and owing in the first 30 days of these chapter 11 cases.

**D. Foreign National.**

13. The Debtors employ one individual who was relocated to the United States from Dubai to assist with the SAP (as defined below) implementation process (the "Foreign National Employee"). Because the Foreign National Employee would not pay income taxes in Dubai, the Debtors have agreed to cover the Foreign National Employee's income tax payments in the United States as part of foreign tax equalization (the "Foreign National Employee Obligations"). As of the Petition Date, the Debtors estimate that approximately $120,000 is accrued and outstanding, some or all of which may become due during the pendency of these chapter 11 cases.

**E. Withholding Obligations.**

14. The Debtors routinely deduct certain amounts from Employees' paychecks during each applicable payroll period on account of miscellaneous items, including garnishments, wage overpayments, certain personal expenses, and other pre-tax deductions payable pursuant to certain of the health and welfare programs (collectively, the "Miscellaneous Deductions") for remittance to various third-party recipients. On average, the Debtors remit approximately $2,987,000 per month on account of the Miscellaneous Deductions. As of the Petition Date, the Debtors estimate that they have collected approximately $2,564,000 in Miscellaneous Deductions from Employee's paychecks that have not yet transferred to the appropriate third parties (the "Unremitted Miscellaneous Deductions"), of which $2,564,000 will become due and owing to the various third parties during the first 30 days of these chapter 11 cases.

15. The Debtors are also required by law to withhold from Employees' Wages certain amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. In addition, the Debtors are required by applicable statutory authority to pay Social Security and Medicare taxes, and based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes," and, together with the Employee Payroll Taxes, the "Payroll Taxes").

16. On average, the Debtors withhold approximately $8,982,000 per month for Payroll Taxes, including both Employee and Debtor-paid portions. As of the Petition Date, the Debtors estimate that approximately $7,710,000 in Payroll Taxes remain outstanding (the "Unremitted Payroll Taxes"), of which $7,710,000 will become due and owing to various taxing authorities during the first 30 days of these chapter 11 cases. The Debtors seek authorization, but

not the direction, to remit the Unremitted Payroll Taxes and the Unremitted Miscellaneous Deductions (together, the "Withholding Obligations") and continue remitting the Withholding Obligations in the ordinary course of business on a postpetition basis.

**F. Payroll Processing.**

17. The Debtors utilize ADP LLC ("ADP"), a third-party payroll service, to process payroll disbursements and provide certain related services, including benefit administration and paycheck deductions, among others. Historically, Debtor KVS Transportation, Inc., ("KVS") used a separate third party payroll service, Microsoft ("Microsoft," and together with ADP, the "Payroll Processors"). Prior to the Petition Date, KVS converted its payroll processing to ADP, with the first payroll processed and funded on July 1, 2016. The Debtors have historically paid approximately $313,000 per month to the Payroll Processors on account of such services.[5] As of the Petition Date, the Debtors estimate that prepetition fees of approximately $626,000 remain outstanding, of which $626,000 will become due and owing during the first 30 days of these chapter 11 cases. The failure to pay prepetition or postpetition payroll servicing fees may delay employee payroll disbursements to the detriment of their Employees and the Debtors' operations. The Debtors seek to continue administering payroll in the ordinary course of business on a postpetition basis (including paying any prepetition or postpetition amounts payable to the Payroll Processors).

**G. Expense Reimbursements.**

18. The Debtors have historically reimbursed Employees for certain expenses incurred in the scope of their employment (collectively, the "Reimbursable Expenses") related to, among other things, travel, lodging, ground transportation, meals, relocation costs, continuing

[5] This amount includes payments that were historically made to Microsoft on behalf of Debtor KVS.

professional education, and other reasonable and documented business-related expenses. As further set forth below, the Debtors reimburse Employees for Reimbursable Expenses in two ways: through direct reimbursement (the "Direct Reimbursement Process") and the use of corporate credit and purchasing cards issued by Wells Fargo, US Bank (in Canada), BBVA Compass Bank, Comdata Network, Inc. ("Comdata"), and Frost National Bank ("Frost") (collectively, the "Credit and Purchase Cards"). Additionally, certain Employees utilize cards issued by WEX Bank (the "WEX Cards") and Esso (the "Esso Cards") to cover fuel expenses (the "Fuel Cards," and together with the Credit and Purchase Cards, the "Purchase Card Programs").

**i. Purchase Card Programs.**

19. Approximately 2,061 Employees hold Credit and Purchase Cards, which are typically used to cover Reimbursable Expenses incurred in the ordinary course of business. The Debtors repay the amounts outstanding on the Credit and Purchasing Cards directly to Wells Fargo, U.S. Bank (in Canada), BBVA Compass Bank, Comdata, and Frost, as appropriate, on a monthly, biweekly, weekly, or daily basis, depending on the issuer.

20. On account of the Credit and Purchase Cards issued by Wells Fargo (the "Wells Cards"), the Debtors have deposited $1,000,000 with Wells Fargo and have an aggregate credit limit of $1,000,000, which the Debtors pay down on a weekly basis. Approximately 795 Employees hold Wells Cards. In connection with the Wells Cards, Wells Fargo is authorized to make advances from time to time on behalf of the Debtors with a maximum exposure of $1,000,000. As security for all indebtedness owed by the Debtors to Wells Fargo on account of the Wells Cards, the Debtors have granted Wells Fargo a security interest in Debtor C&J Spec-Rent Services, Inc.'s Collateral Account 4943909937 (the "C&J Spec-Rent Account"), pursuant

to which the Debtors are required to maintain a collective minimum deposit balance of $1,000,000 in collected funds (collectively, the "Wells Fargo Obligations").

21. Approximately 119 Employees hold Credit and Purchase Cards issued by U.S. Bank (the "U.S. Bank Cards"). The U.S. Bank Cards have individual credit limits ranging from $5,000 to $75,000, with an aggregate credit limit of approximately $3,500,000. There is no deposit requirement on account of the U.S. Bank Cards. Additionally, approximately 44 Employees hold Credit and Purchase Cards issued by BBVA Compass Bank (the "BBVA Cards"). The BBVA Cards have an aggregate credit limit of approximately $1,070,000 with no deposit requirement. The Debtors pay any balances on account of the Credit and Purchase Cards issued by Comdata (the "Comdata Cards") daily, in full, by way of automatic debit. Approximately 1,084 Employees hold Comdata Cards. As security for the Comdata Cards, the Debtors maintain a deposit account at Comdata (the "Comdata Deposit Account"), which held $200,000 as of July 15, 2016. Further, the Debtors hold 51 Credit and Purchase Cards issued by Frost (the "Frost Cards"), of which approximately 19 are currently issued to Employees. In connection with the Frost Cards, the Debtors maintain a pre-paid balance, of which approximately $4,000 is outstanding as of the Petition Date.

22. The Debtors have historically paid approximately $3,120,000 per month on account of the Credit and Purchase Cards.[6] As of the Petition Date, the Debtors estimate that approximately $470,000 on account of the Credit and Purchase Cards is accrued and outstanding, of which $280,000 will become due and owing during the first 30 days of these chapter 11 cases. Further, the Debtors seek authority to continue the Purchase Card Programs subject to the terms

[6] Historically, approximately 91 of the outstanding Credit and Purchasing Cards were issued either by PNC to certain U.S. Employees (the "Legacy Cards"). As of June 29, 2016, the Legacy Cards were deactivated and converted to Wells Fargo. This amount includes amounts that were historically owed on account of the Legacy Cards.

and conditions thereof, including any advances made by Wells Fargo, on a postpetition basis consistent with past practice.

23. Additionally, the Debtors have issued approximately 4,088 Fuel Cards, which are typically used by operational and field personnel to purchase fuel for on-road fleet vehicles while traveling for business and by executives to purchase fuel for personal vehicles. In addition to providing Fuel Cards to individual Employees, the Debtors also assign Fuel Cards to specific assets. For example, a specific piece of equipment in the field may have its own dedicated Fuel Card assignment. The Fuel Card program is used to prevent Employees from having to use personal funds for business related mileage expenses.

24. The Debtors issue the WEX Cards to U.S. Employees and the Esso Cards to Canadian Employees. The WEX Cards have an aggregate credit limit of $198,000. As security for all indebtedness owed by the Debtors to WEX Bank ("WEX"), the Debtors maintain a deposit account with WEX (the "WEX Deposit Account"). As of July 15, 2016, the WEX Deposit Account held $200,000. The Debtors make direct debit payments to WEX daily on account of the WEX Cards. The Esso Cards have an aggregate credit limit of $50,000 with payments made weekly in arrears. The Debtors have historically owed WEX approximately $1,440,000 and Esso approximately $40,000 per month in connection with the Fuel Cards. As of the Petition Date, the Debtors estimate that approximately $121,000 is accrued and outstanding on account of the Fuel Cards, all of which will become due and owing during the first 30 days of these chapter 11 cases.

**ii. Out of Pocket Expenses.**

25. The Debtors reimburse certain out of pocket business expenses incurred by the Employees, including expenses for mileage, tolls, parking, and other small dollar business

related purchases (collectively, the "Out of Pocket Expenses"). While employees are encouraged to use the Credit and Purchase Cards for business related expenses, Employees who use their personal credit cards or cash for Reimbursable Expenses incurred in the ordinary course of business are entitled to reimbursement after certain approvals are received, in accordance with internal policies and procedures, which may vary across Debtor entities. The Debtors have historically paid approximately $36,000 per month on account of such Out of Pocket Expenses. As of the Petition Date, the Debtors estimate that approximately $72,000 in Out of Pocket Expenses have been accrued and remain unpaid, of which $36,000 will become due and owing during the first 30 days of these chapter 11 cases.

**iii. Tuition Reimbursement.**

26. The Debtors reimburse certain tuition costs and other educational expenses incurred by Employees (the "Tuition Reimbursement Program"). The Tuition Reimbursement Program, however, is currently on-hold. As of the Petition Date, less than five Employees continue to receive reimbursement for the current semester. As of the Petition Date, the Debtors estimate that accrued prepetition Tuition Reimbursement Program payments of approximately $15,000 will become payable by July 31, 2016.

**iv. Employee Relocation Program.**

27. The Debtors further provide certain Employees with relocation assistance from KCS Ally Relocation services and reimburse relocation-related expenses (collectively, the "Relocation Expenses") to incentivize desirable "new hire" candidates to accept positions with the Debtors or incentivize existing Employees to accept transfers to other locations. On average, the Debtors pay approximately $13,000 per month on account of Relocation Expenses. As of the Petition Date, the Debtors estimate they owe approximately $284,000 on account of Relocation

Expenses and related service fees for 11 U.S. Employees, of which $95,000 will become due and owing during the first 30 days of these chapter 11 cases.

## II. Employee Benefit Programs.

28. The Debtors offer Employees the opportunity to participate in one or more insurance and benefit programs, including, medical, dental, and vision plans, life insurance, short and long-term disability, and other employee benefit plans as described below (collectively, the "Employee Benefit Programs"). The eligibility requirements to participate in such programs vary across Debtor entities. Specifically, all U.S. Employees and MDT Employees working 30 hours or more per week are eligible, whereas all part-time and full-time CJPS Employees working a minimum of 21 hours per week are eligible. By this Motion, the Debtors seek authority to continue the Employee Benefits Programs in the ordinary course and honor any prepetition obligations related thereto.

### A. Health Benefit Programs.

29. As described below, the Debtors offer all eligible Employees the opportunity to participate in a number of health benefit plans, including medical, dental, and vision plans (collectively, the "Health Benefit Programs"). For U.S. Employees, the Debtors pay the Health Benefit Programs monthly in advance. For Canadian Employees, the Debtors pay amounts on account of the Health Benefit Programs monthly in arrears.

#### i. The Medical Plans.

30. The Debtors offer comprehensive, self-funded medical coverage to current U.S. Employees (the "BlueCross Medical Plan"), administered by BlueCross BlueShield of Texas ("BlueCross") and prescription drug coverage through Express Scripts. Approximately 4,059 U.S. Employees are enrolled in the BlueCross Medical Plan. Additionally, the Debtors offer a fully-insured medical option solely for California Employees administered by Kaiser Permanente

(the "Kaiser Medical Plan," and together with the BlueCross Medical Plan, the "U.S. Medical Plans"). Approximately 451 California Employees are enrolled in the Kaiser Medical Plan. Under the U.S. Medical Plans, participants receive coverage for, among other things, preventive care, doctor visits, hospital care, prescription drugs, and wellness. Monthly health care contributions paid under the Medical Plans vary depending on whether the participant has dependents covered by the applicable plan. Participants pay bi-weekly contributions which are deducted from their paychecks.

31. The Debtors offer similar coverage to current Canadian Employees administered by Manulife (the "Manulife Medical Plan," and together with the BlueCross Medical Plan and the Kaiser Medical Plan, the "Medical Plans"). The Manulife Medical Plan offered by the Debtors is fully-insured for MDT Employees and self-funded for CJPS Employees. Approximately 252 Canadian Employees are enrolled in a Manulife Medical Plan. The Manulife Medical Plan is paid by the Debtors for all MDT Employees, CJPS rig managers, and single CJPS Employees. The Debtors pay approximately 80% of the Manulife Medical Plan for CJPS Employees with dependents.

32. The Debtors' monthly cost to provide the Medical Plans on behalf of their Employees is approximately $4,897,000, of which approximately $2,121,000 is funded by deductions from participating eligible Employees, as applicable. As of the Petition Date, the Debtors estimate that approximately $4,221,000 is accrued and outstanding on account of the Medical Plans, of which $4,221,000 will become due and owing within the first 30 days of these chapter 11 cases.

**ii. The Dental Plan.**

33. The Debtors also offer their U.S. Employees dental insurance through a fully-insured plan administered by Cigna (the "Cigna Dental Plan"). Approximately 4,495 U.S. Employees are enrolled in the Dental Plan. The Debtors' monthly cost to provide the Dental Plan on behalf of their U.S. Employees is approximately $226,000, of which approximately $126,000 is funded by deductions from participating eligible U.S. Employees.

34. The Debtors offer their Canadian Employees a similar dental plan administered by Manulife (the "Manulife Dental Plan, and together with the Cigna Dental Plan, the "Dental Plans"). The Manulife Dental Plan offered by the Debtors is fully-insured for MDT Employees and self-funded for CJPS Employees. Approximately 252 Canadian Employees are enrolled in a Manulife Dental Plan. The Manulife Dental Plan is paid by the Debtors for all MDT Employees, CJPS rig managers, and single CJPS Employees. The Debtors pay approximately 80% of the Manulife Dental Plan for CJPS Employees with dependents.

35. The Debtors' monthly cost to provide the Dental Plans on behalf of their Employees is approximately $238,000, of which approximately $133,000 is funded by deductions from participating eligible Employees, as applicable. As of the Petition Date, the Debtors estimate that they owe approximately $317,000 on account of the Dental Plans, of which $317,000 will become due and owing within the first 30 days of these chapter 11 cases.

**iii. The Vision Plan.**

36. The Debtors also offer eligible U.S. Employees the option of participating in a fully-insured vision plan administered by VSP (the "VSP Vision Plan"). Approximately 4,043 U.S. Employees are enrolled in the VSP Vision Plan. The Debtors' monthly cost to provide the

VSP Vision Plan on behalf of their U.S. Employees is fully funded by deductions from participating eligible U.S. Employees.

37. Similarly, the Debtors offer eligible Canadian Employees a vision plan administered by Manulife (the "Manulife Vision Plan," and together with the VSP Vision Plan, the "Vision Plans"). The Manulife Vision Plan offered by the Debtors is fully-insured for MDT Employees and self-funded for CJPS Employees. The Manulife Vision Plan is paid by the Debtors for all MDT Employees, CJPS rig managers, and single CJPS Employees. The Debtors pay approximately 80% of the Manulife Vision Plan for CJPS Employees with dependents. As of the Petition Date, the Debtors estimate that they owe approximately $24,000 on account of the Vision Plans, of which $24,000 will become due and owing within the first 30 days of these chapter 11 cases.

**B. Flexible Spending Accounts.**

38. The Debtors offer U.S. Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for certain out-of-pocket health care and dependent care expenses (the "Flexible Spending Program"). Approximately 628 U.S. Employees participate in the Flexible Spending Program. At the beginning of each year, participating U.S. Employees may contribute up to $2,250 in the healthcare account and up to $5,000 in the dependent care account by deducing such amounts from their paychecks. As of the Petition Date, the Debtors do not believe that they owe any prepetition amounts on account of the Flexible Spending Program. Nonetheless, the Debtors seek authority, but not direction, to continue the Flexible Spending Program in the ordinary course of business on a postpetition basis.

**C. Health Savings Account.**

39. The Debtors offer Canadian Employees the opportunity to participate in a health savings account plan (the "HSA"). Under the HSA, the Debtors contribute $250 each year on behalf of participating Canadian Employees. In connection with the HSA, the Debtors are invoiced on a monthly basis for amounts used by eligible Canadian Employees and certain administrative fees and expenses. There is no payroll deduction for Canadian Employees as part of the HSA. Additionally, the Debtors allow new hires to receive the full $250 benefit when hired. If an eligible Canadian Employee is terminated or does not otherwise use the full $250 benefit, such amounts are lost and are not credited or carried over from year to year. Approximately 30 Canadian Employees participate in the HSA. As of the Petition Date, the Debtors estimate that they owe approximately $4,000 on account of the HSA, of which $1,000 will become due and owing within the first 30 days of these chapter 11 cases.

**D. Employee Assistance Program.**

40. The Debtors provide Employees with the ability to participate at no cost in confidential counseling and referral services that can assist Employees with a range of personal- and health-related problems (the "Employee Assistance Programs"). The Employee Assistance Programs are administered by ADP for U.S. Employees and LifeWorks for Canadian Employees. The cost of the Employee Assistance Program administered through ADP is bundled with the payroll services provided by ADP. Thus, the Debtors do not incur any additional costs in connection with the Employee Assistance Program administered by ADP. The Debtors do, however, incur costs in connection with the Employee Assistance Program provided by LifeWorks. As of the Petition Date, the Debtors estimate that they owe approximately $1,500 on account of the Employee Assistance Programs, of which $1,500 will become due and owing within the first 30 days of these chapter 11 cases.

**E. Insurance and Disability Programs.**

**i. Life and AD&D Insurance Programs.**

41. The Debtors provide life and accidental death and dismemberment insurance coverage to all eligible U.S. Employees through Prudential, which provides coverage of five times each U.S. Employee's base salary, up to $100,000 for U.S. Employees or $500,000 for executive management, at no cost to the U.S. Employee (the "U.S. Life Insurance"). Additionally, the Debtors provide similar life and accidental death and dismemberment programs to their eligible Canadian Employees through Manulife as set forth below (the "Canadian Life Insurance" and together with the U.S. Life Insurance, the "Basic Life Insurance"):

| **Employee Type** | **Life Insurance** | **AD&D Insurance** |
|---|---|---|
| MDT Employee — Executive | Three times annual salary up to $500,000 | Three times annual salary up to $500,000 |
| MDT Employee | Three times annual salary up to $100,000 | Three times annual salary up to $100,000 |
| CJPS Employee — Salary | Two times annual salary up to $1,000,000 | Two times annual salary up to $500,000 |
| CJPS Employee — Hourly | $100,000 | $100,000 |
| CJPS Employee — Rig Manager | $200,000 | $200,000 |

42. Employees are able to supplement the Basic Life Insurance by buying additional life and accidental death and dismemberment insurance for themselves or their spouse and children (the "Voluntary Life Insurance," and together with the Basic Life Insurance, the "Life Insurance Programs"). On average, the Debtors' monthly cost to provide the Life Insurance Programs on behalf of their Employees is approximately $61,000. The Debtors pay amounts due and owing under the Life Insurance Programs monthly in advance. As of the Petition Date, the Debtors estimate that approximately $92,000 is accrued and outstanding on account of the Life Insurance Programs, of which $61,000 will become due and owing within the first 30 days of these chapter 11 cases.

**ii. Disability Benefits.**

43. The Debtors provide eligible Employees with long-term disability benefits, administered through Prudential or Manulife (the "Long-Term Disability Benefits"). The Debtors also provide eligible Employees with short-term disability benefits (the "Short-Term Disability Benefits," and together with the Long-Term Disability Benefits, the "Disability Benefits"), administered through Prudential or Manulife.

44. For U.S. Employees, the Short-Term Disability Benefits kick in on the eighth consecutive day of absence from work due to a non-work related illness or injury, and can continue for up to 12 weeks. The benefit amount is 60% of the U.S. Employee's base weekly earnings up to a $1,500 weekly maximum. Long-Term Disability Benefits begin after 90 days of consecutive absence from work due to a similar non-work related illness or injury for U.S. Employees. The Long-Term Disability Benefits is 60% of an U.S. Employee's base monthly earnings, up to a maximum of $10,000 for full-time U.S. Employees or $16,667 for executive management located in the U.S.

45. Debtors provide similar Disability Benefits to their eligible Canadian Employees as set forth below:

| **Employee Type** | **Short Term Disability** | **Long Term Disability** |
|---|---|---|
| MDT Employee — Executive MDT Employee | 66.67% of weekly earnings up to $1,000 per week to begin after seven days of consecutive absence from work due to an illness or the first day due to an accident or hospitalization. | 66.67% of monthly earnings up to $6,000 to begin after 120 days. |
| CJPS Employee — Salary | Continuation of salary to begin after 14 days of consecutive absence. | 66.67% of the first $4,500 of monthly earnings and 50% of the remainder to begin after 26 weeks. |

| Employee Type | Short Term Disability | Long Term Disability |
|---|---|---|
| CJPS Employee — Hourly | Maximum of $800 per week to begin after 14 days of consecutive absence or the first day of hospitalization. | $2,300 a month with the option to elect $3,500 a month to begin after 17 weeks. |
| CJPS Employee — Rig Manager | $975 a week with the option to elect $1,200 a week to begin after 14 days of consecutive absence or the first day of hospitalization. | $5,000 a month with the option to elect $6,250 a month to begin after 17 weeks. |

46. The Debtors' monthly cost to provide the Long-Term Disability Benefits on behalf of their Employees is fully funded from Employee contributions, as applicable, whereas the Short-Term Disability Benefits for all eligible U.S. Employees and MDT Employees are funded from Employer contributions. The Short-Term Disability Benefits for CJPS Employees are fully funded from Employee contributions. On average, the Debtors pay approximately $74,000 per month on account of the Disability Benefits. The Debtors pay amounts on account of the Disability Benefits monthly in advance. As of the Petition Date, the Debtors estimate that approximately $188,000 is accrued and outstanding on account of the Disability Benefits, of which $188,000 will become due and owing within the first 30 days of these chapter 11 cases.

**iii. Supplemental Insurance.**

47. Historically, the Debtors have provided eligible U.S. Employees with the opportunity to purchase supplemental insurance coverage for critical illness, cancer, and hospital confinement, among others, administered through Colonial Life & Accidental Insurance Company (the "Supplemental Insurance Program"). As of January 2015, the Supplemental Insurance Program was suspended and no new U.S. Employees are able to enroll. As of the Petition Date, approximately 579 U.S. Employees continue to participate in the Supplemental Insurance Program. The Supplemental Insurance Program is fully funded by deductions from participating eligible U.S. Employees. On average, the Debtors pay approximately $65,000 per

month on account of the Supplemental Insurance Program. As of the Petition Date, the Debtors estimate that approximately $130,000 is accrued and outstanding on account of the Supplemental Insurance Program, of which $130,000 will become due and owing within the first 30 days of these chapter 11 cases.

**F. Retirement Plans.**

48. The Debtors maintain a retirement savings plan for the benefit of eligible U.S. Employees in accordance with the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"). Additionally, the Debtors maintain a Roth IRA retirement savings plan for all eligible U.S. Employees (the "Roth Plan," and together with the 401(k) Plan, the "U.S. Retirement Plans"). Both U.S. Retirement Plans are administered by Fidelity Investments. All eligible U.S. Employees have the option of participating in either the 401(k) Plan or the Roth Plan. U.S. Employees are generally eligible to participate in the U.S. Retirement Plans on the first day of the month following their date of hire. Approximately 2,300 U.S. Employees currently participate in the U.S. Retirement Plans.

49. The Debtors also maintain a registered retirement savings plan (the "RRSP") and a non-registered retirements savings plan (the "NRRSP," and together with the RRSP and the U.S. Retirement Plans, the "Retirements Plans") for eligible Canadian employees. Approximately 225 Canadian Employees currently participate in the RRSP. As of the Petition Date, no Canadian Employees are currently enrolled in the NSRRP.

50. The Debtors withhold approximately $725,000 each month from participating Employees paychecks on account of the Retirement Plans. As of the Petition Date, the Debtors estimate that they are holding approximately $400,000 in retirement savings contributions that have been withheld from Employees' paychecks, of which $400,000 will become due and owing within the first 30 days of these cases.

**G. Severance Program.**

The Debtors have historically maintained a severance program under which U.S. Employees are entitled to a certain number of weeks of base pay determined by their length of service (the "U.S. Severance Program"). All full time U.S. Employees working more than 30 hours per week and who have been continuously employed by the Debtors for 365 days or more are eligible to participate in the U.S. Severance Program. Under the U.S. Severance Program, and upon involuntary termination, each eligible U.S. Employee is entitled to receive a lump sum cash payment in an amount equal to one week's base pay per year of continued service, subject to certain caps. The Debtors do not have a formal severance policy for Canadian Employees. Rather, severance payments are paid pursuant to the Alberta Employment Standards Code and common law and are determined on a case by case basis (the "Canadian Severance Program," and with the U.S. Severance Program, the "Severance Programs").

51. On average, the Debtors pay approximately $9,660,000 on account of the Severance Programs on an annual basis. As of the Petition Date, the Debtors estimate that approximately $250,000 is accrued and outstanding on account of the Severance Programs, some or all of which will become due during the pendency of these chapter 11 cases. By this Motion the Debtors seek authority, but not direction, to pay such amounts on account of the Severance Programs on a final basis only.

52. The Debtors believe that it is important that they fulfill their obligations under the Severance Programs to reassure all Employees that the Debtors intend to honor their obligations to Employees, including those obligations incurred postpetition under the Severance Programs. Importantly, the Debtors do not seek the authority to pay any obligations under the Severance Programs to any "insider" (as the term is defined in section 101(3) of the Bankruptcy Code), so

the Debtors submit that section 503(c)(2) of the Bankruptcy Code with respect to severance payments to insiders does not apply to the relief requested herein.

**H. Vacation, Holiday, Sick Time, and Other Leave of Absence Time.**

53. The Debtors provide vacation time to all full-time Employees as a paid time-off ("PTO") benefit (the "Vacation Time"). Length of employment generally determines the amount of Vacation Time available to each eligible Employee. Generally, Employees who do not use their Vacation Time by the end of the calendar year, forfeit any remaining balances. For Employees located in Montana, California, and Canada, however, Vacation Time accrues on a calendar year basis. The rate of accrual for such Employees is determined by their length of continuous service. All Employees located in Montana, California, and Canada who are eligible to take Vacation Time and who terminate their employment for any reason are entitled to the cash equivalent of any accrued but unused Vacation Time through their termination date. On average the Debtors pay approximately $61,000 per month on account of cash obligations associated with the accrued but unused Vacation Time of terminated Employees. Historically, the Debtors pay any accrued but unused Vacation Time immediately upon termination. As of the Petition Date there are no amounts currently outstanding on account of unused Vacation Time. Nonetheless, the Debtors have approximately $826,000 of accrued obligations on account of unused Vacation Time, some of which may become due and owing during these chapter 11 cases if Employees located in Montana, California, and Canada are terminated. By this Motion, the Debtors do not seek authority to pay Vacation Time to any Employee in excess of the $12,850 priority cap imposed by section 507(a)(4) of the Bankruptcy Code.

54. Additionally the Debtors provide sick time for all full-time Employees as a PTO benefit (the "Sick Time"). Eligible Employees will be granted up to 5 days or 40 hours of Sick Time each calendar year. Employees may not carry over Sick Time from one calendar to the

next, thus any sick time not used by December 31st is deemed forfeited. In the event of any voluntary or involuntary termination of employment, all unused Sick Time will be forfeited.

55. The Debtors also offer Employees holidays throughout the year, ten for U.S. Employees and nine for Canadian Employees (collectively, the "Holidays"). Generally, eligible Employees are not required to work on designated Holidays and are paid for Holiday time at their base rate of pay. Employees who are required to work on Holidays are eligible for additional Holiday pay. On average the Debtors pay approximately $11,800,000 per year on account of the Holiday policies. As of the Petition Date, the Debtors submit that there are no amounts accrued and outstanding on account of Holiday compensation, but the Debtors seek authority to continue their Holiday policies on a postpetition basis consistent with past practice.

56. Employees may also take certain other unpaid leaves of absence for personal reasons (collectively, the "Leaves of Absence Time"). Leaves of Absence Time includes family medical leaves, pregnancy, adoption and foster care leaves, military, jury duty, voting leaves, personal leaves, and bereavement leaves. Employees are not entitled to cash payments for unused Leave of Absence Time. Thus, the Debtors do not believe that there are any obligations owing as of the Petition Date on account of Leave of Absence Time.

57. The Debtors believe that the continuation of the Vacation Time, Sick Time, Holidays, and Leave of Absence Time policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which eligible Employees have come to depend. Therefore, the Debtors seek the authority, but not the direction, to allow eligible Employees to use their Vacation Time, Sick Time, Holidays, and Leave of Absence Time in the ordinary course of business on a postpetition basis, and to pay any Unpaid Vacation Time accrued in the ordinary course of

business that comes due and owing within the first 30 days of these chapter 11 cases, up to $12,850 per Employee.

**III. Employee Incentive Programs.**

58. By this Motion, the Debtors seek authority to continue their ordinary course incentive programs and to honor their obligations to non-insider Employees under the pre-existing programs described below; *provided that* "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code) of the Debtors are excluded from the relief requested herein. To the extent the Debtors propose to make a cash payment to, or implement an incentive plan for, any insiders or senior executives, the Debtors will seek separate approval from the Court with respect to such programs.

59. As described more fully below, the Debtors offer certain incentive programs (collectively, the "<u>Employee Incentive Programs</u>") as an additional component of overall Employee Compensation. The Debtors believe the Employee Incentive Programs drive Employees' performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency and safety of the Debtors' operations.

**A. Employee Referral Stipend.**

44. The Debtors offer a referral program to Canadian Employees within the service rig division (the "<u>Employee Referral Stipend</u>"). As part of the Employee Referral Stipend, the Debtors will provide a cash payment to Canadian Employees for every referral that successfully completes any pre-employment requirements, is hired by the Debtors, and is employed by the Debtors for a specific six month period of time. All Canadian Employees participate in the Employee Referral Stipend. On average, the Debtors pay approximately $1,000 per month on account of the Employee Referral Stipend. As of the Petition Date, the Debtors estimate that

they owe approximately $2,000 on account of the Employee Referral Stipend, of which $2,000 will become due and owing during the first 30 days of these chapter 11 cases.

**B. SAP Launch Program.**

45. The Debtors offer an incentive program to certain U.S. Employees who were involved in the systems, applications, and products ("SAP") implementation process (the "SAP Launch Program"). During the second half of 2015, the Debtors commenced the SAP implementation process in an effort to streamline software programs and systems applications to enhance operations enterprise-wide. SAP implementation is a tremendous undertaking that often affects every division and employee of a company in some capacity and can take years to complete. The Debtors were positioned for SAP to go live on or before July 11, 2016. Amidst restructuring discussions, the Debtors decided to delay the launch of SAP to focus on service quality and customer attention in the event of a chapter 11 filing. As part of the SAP Launch Program, the Debtors will provide a cash payment to certain U.S. Employees in recognition for their commitment and extra hours required for the implementation of SAP. As of the Petition Date, the Debtors estimate that they owe approximately $68,750 on account of SAP Launch Program, some or all of which will become due during the pendency of these chapter 11 cases. By this Motion the Debtors seek authority, but not direction, to pay such amounts on account of the SAP Launch Program. Importantly, the Debtors do not seek the authority to pay any obligations under the SAP Launch Program to any "insider" (as the term is defined in section 101(3) of the Bankruptcy Code).

## Basis for Relief

**I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.**

**A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.**

46. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. Under section 1129(a)(9)(b) of the Bankruptcy Code, the Debtors must pay these priority claims in full to confirm a chapter 11 plan. Thus, granting the relief sought herein should only affect the timing of certain payments to the Employees and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

**B. Payment of Certain Employee Compensation and Benefits Is Required by Law.**

47. The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b)(1), (d). Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re*

*DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

**II. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity**.

48. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

49. Furthermore, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity." The "doctrine of

necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity"); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

50. The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of chapter 11." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition

unsecured claims of toolmakers as "necessary to avert a serious threat to the chapter 11 process").

51. Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. The majority of the Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

52. Moreover, the Employees provide the Debtors with services necessary to conduct the Debtors' businesses, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases. The oil and gas service industry is a highly specialized business that requires unique technical expertise. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—efforts that may not be successful given the overhang of these chapter 11 cases. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the

greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

53. Indeed, bankruptcy courts in the Fifth Circuit have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested herein. *See, e.g.*, *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D.Tex. July 1, 2016); *In re Ultra Petrol. Corp.*, No 16-32202 (MI) (Bankr. S.D. Tex. June 14, 2016); *In re Linn Energy LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016); *In re Goodrich Petrol. Corp.*, No. 16-31975 (MI) (Bankr. S.D. Tex. May 4, 2016); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016); *In re Energy XXI Ltd.*, No. 16-31928 (DRJ) (Bankr. S.D. Tex. April 15, 2016); *In re Sherwin Alumina Co.*, No 16-20012 (DRJ) (Bankr. S.D. Tex. Jan. 13, 2016); *In re RAAM Glob. Energy Co.*, No. 15-35615 (MI) (Bankr. S.D. Tex. Nov. 18, 2015); *In re BPZ Res., Inc.*, No. 15-60016 (DRJ) (Bankr. S.D. Tex. Mar. 10, 2015).[7] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with past practice.

## III. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

54. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits, as applicable. Accordingly, the Debtors believe

---

[7] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**Emergency Consideration**

55. In accordance with Bankruptcy Local Rule 9013-1(h), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

56. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Reservation of Rights**

57. Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim; (c) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (d) an admission as to the validity, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (e) a waiver of any claims or causes of action which may exist against any entity.

**Notice**

58. The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) Davis Polk & Wardwell LLP and Diamond McCarthy LLP as counsel to Cortland Capital Market Services LLC as administrative agent under the Debtors' secured credit agreement and agent for the proposed debtor-in-possession financing facility; (d) Nabors Industries Ltd. and counsel thereto; (e) the United States Attorney's Office for the Southern District of Texas; (f) the Internal Revenue Service; (g) the Environmental Protection Agency; (h) the office of the attorneys general for the states in which the Debtors operate; (i) the Securities and Exchange Commission; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.

**No Prior Request**

59. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: July 20, 2016

/s/ *Stephen Thomas Schwarzbach Jr.*

Stephen Thomas Schwarzbach Jr. (Texas Bar No. 24079288)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
600 Travis Street
Suite 3300
Houston, Texas 77002
Telephone: (713) 835-3600
Facsimile: (713) 835-3601
Email: steve.schwarzbach@kirkland.com

- and -

James H.M. Sprayregen, P.C.
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Chad J. Husnick (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
marc.kieselstein@kirkland.com
chad.husnick@kirkland.com
emily.geier@kirkland.com

- and -

Bernard Given II (Texas Bar No. 07990180)
Lance Jurich (*pro hac vice* admission pending)
**LOEB & LOEB LLP**
10100 Santa Monica Boulevard
Suite 2200
Los Angeles, California 90067
Telephone: (310) 282-2000
Facsimile: (310) 282-2200
Email: bgiven@loeb.com
ljurich@loeb.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on July 20, 2016, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Stephen Thomas Schwarzbach Jr.*
One of Counsel