## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CJ HOLDING CO., *et al.*,[1] | § | Case No. 16-33590 (DRJ) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

**EMERGENCY MOTION OF
CJ HOLDING CO., *ET AL.*, FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO OBTAIN POSTPETITION SECURED
FINANCING, (II) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) AUTHORIZING THE USE OF CASH COLLATERAL, (IV) GRANTING
ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

> **THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER FOR <u>JULY 21, 2016 AT 2:00 PM (CT)</u> BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), are: CJ Holding Co. (4586); Blue Ribbon Technology Inc. (6338); C&J Corporate Services (Bermuda) Ltd.; C&J Energy Production Services-Canada Ltd.; C&J Energy Services, Inc. (3219); C&J Energy Services Ltd.; C&J Spec-Rent Services, Inc. (0712); C&J VLC, LLC (9989); C&J Well Services Inc. (5684); ESP Completion Technologies LLC (4615); KVS Transportation, Inc. (2415); Mobile Data Technologies Ltd.; Tellus Oilfield Inc. (2657); Tiger Cased Hole Services Inc. (7783); and Total E&S, Inc. (5351). The location of the Debtors' service address is 3990 Rogerdale, Houston, Texas 77042.

CJ Holding Co. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),[2] file this motion (this "Motion") seeking entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"),[3] and a final order (the "Final Order,"[4] and, together with the Interim Order, the "DIP Orders").  In support of this Motion, the Debtors respectfully submit (a) the *Declaration of Stephen Hannan In Support of the Emergency Motion of CJ Holding Company, et al., for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, attached hereto as **Exhibit B** (the "Hannan Declaration"), and (b) the First Day Declaration.  In further support of this Motion, the Debtors respectfully state the following:

### Preliminary Statement

1.      The Debtors and their non-Debtor affiliates (collectively, "C&J") comprise an oilfield services company that offers a range of completion and production related services necessary to, for example, prepare drilled oil and gas wells for extraction, stimulate well production, and maintain producing wells.  Substantially all of C&J's customers are oil and natural gas exploration and production ("E&P") companies.  The oil and gas industry has

---

[2]    A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Mark Cashiola in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on July 20, 2016 (the "Petition Date").

[3]    Capitalized terms not otherwise defined herein will have the meanings given to them in the Interim Order.  The description of the capital structure (including the priority, perfection, and collateral (if any)) of the Debtors contained herein is solely for illustrative purposes.  To the extent that there is any discrepancy between the Interim Order and this Motion, the terms of the Interim Order, as entered by the Court, shall control.

[4]    The Debtors intend to file the form of Final Order prior to the Final Hearing (as defined herein).

experienced a drastic shift in operating conditions over the course of the past two years due to severely decreased commodities prices.  As a result, new drilling activity in the upstream sector is substantially decreased from late-2014 highs and dozens of E&P companies have been forced to seek bankruptcy protection in recent months.  The Debtors' financial success is tied closely to upstream capital expenditures—*i.e.*, drilling activity—and thus the financial health of its E&P company customer base.  Additionally, the Debtors operate in a highly-competitive industry where its larger, more geographically diversified, and often better-capitalized competitors are in a position to exert significant downward pressure on pricing—some of which have attempted to take advantage of current operating conditions to gain market share by, for example, offering services below breakeven pricing.

2.      The foregoing circumstances have significantly strained C&J's enterprise-wide liquidity and ability to comply with the financial covenants under its prepetition credit agreement (the "Prepetition Credit Agreement") and ultimately precipitated the Debtors' chapter 11 filing.  Before arriving in chapter 11, however, the Debtors managed to negotiate a consensual resolution with the holders (the "Prepetition Lenders") of approximately 83 percent of the nearly $1.4 billion in secured funded-debt obligations outstanding under the Prepetition Credit Agreement.  The terms of this resolution are set forth in the Restructuring Support and Lock-Up Agreement, dated as of July 8, 2016, a copy of which is attached to the First Day Declaration as Exhibit A (as amended from time to time and including all exhibits thereto, the "RSA").  The RSA is the product of months of good-faith, arm's-length negotiations between the Debtors and a steering committee of the Prepetition Lenders (the "Steering Committee").  The transactions contemplated by the RSA will result in a ***total*** deleveraging of C&J's balance sheet—all amounts owing by the Debtors under the Prepetition Credit Agreement will be fully equitized—and

provide substantial post-emergence liquidity in the form of a $200 million rights offering (the "Rights Offering"), backstopped by certain of the Prepetition Lenders.

3.      Significantly, certain of the Prepetition Lenders (in their capacity as such, the "DIP Lenders") have also agreed to fund a $100 million new money debtor-in-possession financing facility (the "DIP Facility").  The DIP Facility is essential to the continued operation of the Debtors' businesses and the Debtors' efforts to consummate the transactions contemplated by the RSA.  With the funds from the DIP Facility, the Debtors will have sufficient time and breathing room to pursue the transaction available to their businesses that will maximize recoveries for their estates and creditors.

4.      The Debtors and their advisors canvassed the market for potential debtor-in-possession financing sources and were unable to locate any viable alternative to the DIP Facility. Moreover, the DIP Facility is an integrated component of the comprehensive restructuring contemplated by the RSA that will provide the Debtors with an additional $200 million of post-emergence liquidity.  The RSA is the only viable restructuring alternative available to the Debtors—and the transactions contemplated by the RSA will maximize the value of the Debtors' enterprise. Upon consummation of the restructuring contemplated by the RSA, the Debtors will be well-positioned to both weather the industry storm and capitalize on their attractive operating footprint and established reputation for quality service as the market rebounds.

5.      While the Debtors have implemented various operational right-sizing measures in response to current depressed operating conditions, their liquidity position remains constrained. In light of the market backdrop, the Debtors' management team and advisors determined that the Debtors would not be able to fund both ongoing operations and the costs of these chapter 11 cases without additional financing.  Accordingly, the Debtors require immediate access to up to

$25 million under the DIP Facility in addition to continued use the Prepetition Lenders' cash collateral (the "Cash Collateral") to avoid any further harm to their business—already battered by the severe market conditions—and preserve value enterprise wide and provide comfort to their customer and vendor constituencies.  In light of the Mineral Contractor issues described in more detail in the First Day Declaration, the Debtors are likely to experience customer flight in the wake of their chapter 11 filing absent a clear indication of their financial wherewithal to continue to pay their vendors.  Access to the DIP Facility and Cash Collateral will allow the Debtors to responsibly fund the chapter 11 cases, continue their business operations, maintain the value of their asset base, and carry out the terms of the RSA.

6.      For these reasons, and for the reasons set forth below, in the Hannan Declaration, and in the First Day Declaration, the Debtors believe that entering into the DIP Credit Agreement will maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment.  Accordingly, the Debtors respectfully request that the Court enter the DIP Orders.

**Concise Statement Pursuant to Bankruptcy Rule 4001 and the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases**

7.      The Debtors seek entry of the DIP Orders:

a.      ***DIP Facility:***  authorizing the Debtors to enter into the $100 million DIP Facility on the terms and conditions set forth in the Interim Order and the DIP Documents (as defined below), pursuant to which DIP Facility the Debtors are authorized, upon entry of the Interim Order, to borrow up to an aggregate principal amount not to exceed $25 million;

b.      ***DIP Documents:***  authorizing the Debtors to enter into the Superpriority Secured Debtor-in-Possession Credit Agreement to be dated on or around July 26, 2016, among the Debtors, the DIP Lenders, and Cortland Capital Market Services LLC, acting as administrative agent and collateral agent (in such capacities, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties"), substantially in the form annexed as **Exhibit 1** to **Exhibit A** attached hereto (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement") and certain ancillary documentation (together with the DIP Credit Agreement, the "DIP Documents");

c. ***Adequate Protection:*** authorizing the Debtors to grant adequate protection in connection with the Prepetition Credit Agreement and all related security agreements (the "Prepetition Loan Documents") and all of the Debtors' secured obligations arising thereunder;

d. ***Cash Collateral:*** authorizing the Debtors to continue to use Cash Collateral subject to the restrictions set forth in the DIP Documents and the Interim Order and the granting of adequate protection to the Prepetition Secured Parties with respect thereto;

e. ***Debtor Stipulations:*** approving certain stipulations with respect to the Prepetition Loan Documents and the liens and security interests arising therefrom;

f. ***Superpriority Claims and DIP Liens:*** granting superpriority administrative claims and priming liens on all prepetition and postpetition property of the Debtors' estates (other than the certain excluded property) and all proceeds thereof (including, subject to entry of the Final Order, any proceeds of certain avoidance actions arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions," and proceeds therefrom, the "Avoidance Proceeds");

g. ***506(c) Waiver:*** subject to entry of the Final Order, authorizing the Debtors' waiver of the right to surcharge the Prepetition Lenders' and DIP Lenders' collateral pursuant to section 506(c) of the Bankruptcy Code;

h. ***Equities of the Case Waiver:*** subject to entry of the Final Order, authorizing the Debtors' waiver of any rights under the "equities of the case" exception in section 552(b) of the Bankruptcy Code and the equitable doctrine of marshaling;

i. ***Automatic Stay:*** modifying of the automatic stay of section 362 of the Bankruptcy Code; and

j. ***Final Hearing:*** scheduling a final hearing on the motion.

8. The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures.[5]

---

5   The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the

6

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Borrowers**<br>Bankruptcy Rule<br>4001(c)(1)(B) | C&J Energy Services Ltd. and CJ Holding Co.<br><br>*See* DIP Credit Agreement Preamble; Interim Order Preamble. |
| **Guarantors**<br>Bankruptcy Rule<br>4001(c)(1)(B) | Blue Ribbon Technology Inc.; C&J Corporate Services (Bermuda) Ltd.; C&J Energy Production Services-Canada; C&J Energy Services, Inc.; C&J Spec-Rent Services, Inc.; C&J VLC, LLC; C&J Well Services Inc.; ESP Completion Technologies LLC; KVS Transportation, Inc.; Mobile Data Technologies Ltd.; Tellus Oilfield Inc.; Tiger Cased Hole Services Inc.; and Total E&S, Inc.<br><br>*See* DIP Credit Agreement, Art. I.; Interim Order Preamble. |
| **DIP Financing Lenders**<br>Bankruptcy Rule<br>4001(c)(1)(B) | Certain of the Prepetition Lenders identified as a "Lender" on the signature pages to the DIP Credit Agreement and each other lender that becomes a "Lender" in accordance with the DIP Credit Agreement, and in each case, their successors and assigns.<br><br>*See* DIP Credit Agreement, Art. I. |
| **Term**<br>Bankruptcy Rule<br>4001(b)(l)(B)(iii),<br>4001(c)(1)(B) | The earliest of:<br><br>(a) March 31, 2017;<br><br>(b) the date that is seven days after the Petition Date (or such later date as the Required Lenders (as defined in the DIP Credit Agreement, the "<u>Required Lenders</u>") may agree in their reasonable discretion) if the Interim Order has not been entered prior to such date;<br><br>(c) the date that is 40 days after the entry of the Interim Order (or such later date as the Required Lenders may agree in their reasonable discretion) if the Final Order has not been entered prior to such date;<br><br>(d) the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and no later than the effective date) of a chapter 11 plan of reorganization that is confirmed by the Bankruptcy Court; and<br><br>(e) the date of acceleration of the loans and the termination of the commitments with respect to the Facility pursuant to Section 8.02 of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, Art. I. |
| **Commitment**<br>Bankruptcy Rule<br>4001(c)(1)(B) | Each DIP Lender agrees to make loans to the Debtors in an aggregate amount not to exceed its commitment, which in the aggregate across the DIP Lenders is $100 million and to be made available in up to three borrowings:<br><br>(a) the initial borrowing shall be in an amount equal to the lesser of $25 million, and the amount authorized in the Interim Order;<br><br>(b) the second borrowing shall occur within 2 business days after the entry of the Final Order and shall be in an amount that together with the initial drawing shall be not less than $50 million in the aggregate; and<br><br>(c) the remaining balance shall be available to be drawn in one drawing thereafter through and including the DIP Facility termination date. |

applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | *See* DIP Credit Agreement, §§ 2.01, 2.02. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Documents contain conditions precedent to each borrowing under the DIP Facility customarily found in loan agreements for similar debtor-in-possession financings and other conditions deemed by the DIP Lenders to be appropriate to the specific transaction, and in any event, including:<br><br>(a) the Effective Date (as defined in the DIP Credit Agreement) shall have occurred on or prior to a date that is no later than three Business Days after the date of the entry of the Interim Order;<br><br>(b) with respect to the initial borrowing, the Interim Order shall be in full force and effect;<br><br>(c) with respect to the second and third borrowings, (A) the Final Order shall have been entered no later than forty days following the date of entry of the Interim Order, (B) the Canadian Recognition Order (as defined in the DIP Credit Agreement, the "Canadian Recognition Order") shall have been entered no later than ten days following the Petition Date and (C) at the time of such borrowing the Final Order and the Canadian Recognition Order shall be in full force and effect;<br><br>(d) with respect to any borrowings on or after the entry of the Final Order , all material "second day orders" shall have been entered and all pleadings related to approval of significant transactions shall be reasonably satisfactory to the Required Lenders (as defined in the DIP Credit Agreement);<br><br>(e) the representations and warranties of each Debtor contained in the DIP Documents shall be true and correct in all material respects on and as of the date of such borrowing;<br><br>(f) no default exists under the DIP Documents, or would result from the proposed borrowing;<br><br>(g) all fees and expenses required to be paid to the DIP Agent on or before the date of the borrowing shall have been paid;<br><br>(h) all fees and expenses required to be paid to the DIP Lenders on or before the date of the borrowing shall have been paid;<br><br>(i) unless waived, all fees required to be paid to counsel to the DIP Agent shall have been paid; and<br><br>(j) the DIP Agent shall have received a request for such borrowing.<br><br>*See* DIP Credit Agreement, §§ 4.01, 4.02. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | The loans under the DIP Facility will bear interest, at the option of the Debtors, at one of the following rates:<br><br>(a) the Base Rate (as defined in the DIP Credit Agreement) plus the applicable margin of 8.00%; or<br><br>(b) the Eurocurrency Rate (as defined in the DIP Credit Agreement) plus the applicable margin of 9.00%.<br><br>During the continuance of a payment event of default under the DIP Documents, overdue amounts will bear interest at an additional two percent per annum.<br><br>*See* DIP Credit Agreement Art. I, § 2.08. |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Use of DIP Facility and Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(ii) | The Debtors may only use the proceeds of the DIP Facility for (a) working capital and general corporate purposes in accordance with the Rolling Budget (as defined in the DIP Credit Agreement); (b) professional fees and expenses whether or not in accordance with the Rolling Budget; and (c) Bankruptcy Court approved administrative expenses for estate professionals and such other expenses to which the Required Lenders may consent in their sole direction, in each case not in contravention of any law or of any of the DIP Documents. *See* DIP Credit Agreement § 6.11. |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition Secured Parties, DIP Agent, and DIP Lenders. *See* Interim Order ¶ 4. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | *Unused Commitment Fee.* The Debtors shall pay to the DIP Agent for the account of each DIP Lender, an unused commitment fee in Dollars equal to 5.00% per annum times the actual daily amount by which the aggregate commitments under the DIP Facility exceed the aggregate outstanding principal amount of loans under the DIP Facility. The unused commitment fee shall accrue at all times during the availability period and shall be due and payable monthly in arrears on the last business day of each month and on the last day of the availability period. *Administrative Agent Fees.* The Debtors shall pay to the DIP Agent for its own account, in cash, an administrative fee in the amount of $50,000 and, without duplication of amounts paid pursuant to the Credit Agreement, the reasonable and documented out-of-pocket fees and expenses of the Administrative Agent. *Original Issue Discount.* The Debtors shall pay for the account of each DIP Lender, an original issue discount equal to 2.00% of the aggregate principal amount of the commitments under the DIP Facility, which original issue discount shall be earned, due and payable on the effective date of the DIP Credit Agreement and calculated by multiplying 2.00% by the aggregate principal amount of commitments under the DIP Facility on the effective date of the DIP Credit Agreement. *See* DIP Credit Agreement § 2.09; Fee Letter. |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) | The use of cash and proceeds from loans under the DIP Facility is subject to a customary budget (the "Approved Budget"), attached to this Motion as **Exhibit C**. *See* DIP Credit Agreement Art. 6. |
| **Reporting Information** Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreement requires compliance with certain periodic reporting covenants that are usual and customary for debtor-in-possession financings like the DIP Facility. *See* DIP Credit Agreement § 6.01. |
| **Variance Covenant** Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreement allows for the following variance percentages for each applicable Testing Period (as defined in the DIP Credit Agreement). |

| Testing Period | Variance Percentage | |
|---|---|---|
|  | Receipts | Disbursements |
| First Testing Period | 75% | 125% |
| Second Testing Period | 75% | 125% |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) | | |
|---|---|---|---|

| | Third Testing Period | 80% | 120% |
|---|---|---|---|
| | Subsequent Testing Period | 80% | 120% |

As of any Testing Date (as defined in the DIP Credit Agreement), for the Testing Period ending on such Testing Date, the Debtors shall not permit:

(a) the aggregate receipts for such Testing Period to be less than, in the aggregate, the applicable variance percentage for the applicable Testing Period of the aggregate receipts line item for such Testing Period;

(b) the aggregate operating disbursements (excluding professional fees and expenses) for such Testing Period to be greater than the applicable variance percentage for the applicable Testing Period, of the aggregate operating disbursements line item for such Testing Period, in each case set forth in the most recent Rolling Budget covering such Testing Period; and

(c) in each case set forth in the most recent Rolling Budget covering such Testing Period.

*See* DIP Credit Agreement Art. 1, § 7.11.

| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall comply with the following chapter 11 milestones (the "Milestones"):<br><br>(a) no later than seven calendar days after the Petition Date, the Court shall have entered the Interim Order;<br><br>(b) no later than 40 calendar days after the entry of the Interim Order, the Court shall have entered the Final Order;<br><br>(c) as promptly as possible, but in no event later than 30 calendar days after the Petition Date, the Debtors shall have filed a chapter 11 plan and disclosure statement;<br><br>(d) no later than 90 calendar days after the Petition Date, the Court shall have entered an order approving the Debtors' disclosure statement;<br><br>(e) no later than 130 calendar days after the Petition Date, the Court shall have entered an order confirming the Debtors' chapter 11 plan;<br><br>(f) no later than seven calendar days after the Petition Date, the Canadian Recognition Order shall have been entered and be in full force and effect; and<br><br>(g) no later than 21 calendar days after entry of the confirmation order, the Debtors shall have consummated their chapter 11 plan.<br><br>*See* DIP Credit Agreement § 6.21. |
|---|---|
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) | All obligations under the DIP Facility shall, subject to the Carve Out:<br><br>(a) pursuant to section 364(c)(1) of the Bankruptcy Code, constitute allowed superpriority administrative expense claims against the Debtors with priority over any and all administrative expenses, diminution in value claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | levy or attachment, which allowed claims (the "<u>Superpriority Claims</u>") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which Superpriority Claims shall be payable from all property of the Debtors and all proceeds thereof (excluding Avoidance Actions but including, effective upon entry of the Final Order, Avoidance Proceeds); |
| | (b)  pursuant to section 364(c)(2) of the Bankruptcy Code, constitute a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all property of the Debtors that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien (collectively, "<u>Unencumbered Property</u>"), other than: (i) the Excluded Property, but including any proceeds of the Excluded Property that do not otherwise constitute Excluded Property; and (ii) the Avoidance Actions, but subject only to and effective upon entry of the Final Order, including any Avoidance Proceeds; |
| | (c)  Pursuant to section 364(d)(1) of the Bankruptcy Code, constitute a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest and lien upon all property of the Debtors, whether now existing or hereafter acquired, that is subject to the existing prepetition liens, which lien shall be senior in all respects to such prepetition liens (collectively, the "<u>Primed Liens</u>") and to any liens and security interests to which such Primed Liens are senior or *pari passu*; and |
| | (d)  Pursuant to section 364(c)(3) of the Bankruptcy Code, constitute a valid, binding, continuing, enforceable, fully-perfected security interest and lien upon all property of the Debtors (other than (x) the Excluded Property, but including any proceeds of Excluded Property that do not constitute Excluded Property and (y) the Avoidance Actions, but, subject only to and effective upon entry of the Final Order, including any Avoidance Proceeds) immediately junior to (i) any valid, perfected and unavoidable liens in existence immediately prior to the Petition Date that are permitted under the Prepetition Credit Agreement to the extent such permitted liens are senior or *pari passu*, and (ii) any such valid and unavoidable permitted liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code. |
| | *See* Interim Order ¶¶ 7, 8.  DIP Credit Agreement § 2.14. |
| **Carve Out**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The "Carve-Out" shall have the meaning set forth in the DIP Orders.<br><br>*See* Interim Order ¶ 7. |
| **506(c) Waiver**<br>Bankruptcy Rule<br>4001(c)(l)(B)(x)<br><br>**Section 552(b)**<br>Bankruptcy Rule<br>4001(c)(l)(B) | Subject only to the Carve-Out, any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders pursuant to the provisions of the Interim Order or the Final Order or the DIP Documents shall be received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (subject to the entry of the Final Order approving the waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code), whether asserted or assessed by, through or on behalf of the Debtors, or section 552(b) of the Bankruptcy Code or the equitable doctrine of marshaling.<br><br>*See* Interim Order ¶ 11. |
| **Stipulations to Prepetition Liens and** | Pursuant to the Interim Order, the Debtors stipulate as follows: |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Claims**<br>Bankruptcy Rule<br>4001(c)(1)(B)(iii) | (a)  As of the Petition Date, the Debtors were justly and lawfully indebted and liable to the Prepetition Secured Parties in the aggregate principal amount of not less than (1) $284,400,000 in respect of loans made and $15,140,000 in respect of letters of credit, in each case issued under the Revolving Facility (as defined in the Prepetition Credit Agreement), (2) $569,250,000 in respect of loans made as the Initial Tranche B-1 Term Loans (as defined in the Prepetition Credit Agreement) and (3) $480,150,000 in respect of loans made as the Initial Tranche B-2 Term Loans (as defined in the Prepetition Credit Agreement) (collectively, the "<u>Prepetition Secured Debt</u>"), which Prepetition Secured Debt has been guaranteed on a joint and several basis by each of the Debtors;<br><br>(b)  the Prepetition Secured Debt constitutes the legal, valid and binding obligations of the Debtors, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code);<br><br>(c)  no portion of the Prepetition Secured Debt or any payments made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Prepetition Loan Documents prior to the Petition Date is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;<br><br>(d)  the liens and security interests granted in connection with the Prepetition Secured Debt (the "<u>Prepetition Liens</u>") pursuant to and in connection with the Prepetition Credit Agreement:<br><br>    (i)  are legal, valid, binding, perfected, enforceable, first-priority liens and security interests in the collateral described in the Prepetition Credit Agreement and ancillary documents (the "<u>Prepetition Collateral</u>");<br><br>    (ii)  were granted to, or for the benefit of, the Prepetition Lenders for fair consideration and reasonably equivalent value;<br><br>    (iii) are not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law; and<br><br>    (iv) as of the Petition Date, are subject and subordinate only to valid, perfected and unavoidable liens permitted under the Prepetition Credit Agreement to the extent that such permitted liens are senior to or *pari passu* with the liens on the Prepetition Collateral.<br><br>*See* Interim Order ¶ 4. |
| **Adequate Protection**<br>Bankruptcy Rules<br>4001(b)(l)(B)(iv),<br>4001(c)(1)(B)(ii) | As adequate protection and solely to the extent of any postpetition diminution in the value, if any, of the Prepetition Lenders' interest in the Prepetition Collateral, the Prepetition Lenders are granted:<br><br>(a)  a security interest in and lien upon all of the Collateral, subject and subordinate only to:  (i) the DIP Liens and any liens on the Collateral to which the DIP Liens are junior; and (ii) the Carve-Out (the "<u>Adequate Protection Liens</u>");<br><br>(b)  subject to the Carve-Out and the Superpriority Claims, a superpriority administrative claim as provided for in section 507(b) of the Bankruptcy Code, junior to the Superpriority Claims (the "<u>507(b) Claim</u>"),  payable from all of the Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds; |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
|  | (c) payment in cash of all reasonable and documented out-of-pocket professional fees and expenses payable to the advisors to the administrative agent (the "Prepetition Agent") under the Prepetition Credit Agreement (including, without limitation, Davis Polk & Wardwell LLP, Diamond McCarthy LLP, FTI Consulting, Inc. and Moelis & Company), subject to the terms set forth in the Interim Order; <br><br>(d) performance of those certain case milestones set forth in Section 6.21 of the DIP Credit Agreement, subject to the terms thereof; and <br><br>(e) The Debtors shall promptly provide the Prepetition Agent with all required written financial reporting and other periodic reporting that is provided to the DIP Agent or the DIP Lenders. <br><br>*See* Interim Order ¶ 13. |
| **Events of Default** <br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreement contains events of default that are usual and customary for debtor-in-possession financings, including: <br><br>(a) failure to pay principal, interest, fees or other amounts when due; <br><br>(b) failure to perform or observe certain terms, covenants, and agreements defined in the DIP Credit Agreement; <br><br>(c) failure to perform or observe any covenant or agreement contained in any DIP Document; <br><br>(d) Any representation, warranty, certification or statement of fact made by or on behalf of any Debtor shall be incorrect or misleading in any material respect when made or deemed made; <br><br>(e) failure to pay certain other material indebtedness or perform certain other material obligations, as set forth in the DIP Credit Agreement; <br><br>(f) any non-Debtor affiliate institutes an insolvency proceeding or such a proceeding is instituted with respect to the affiliate; <br><br>(g) any non-Debtor affiliate becomes unable or admits in writing its inability or fails generally to pay its debts as they become due; <br><br>(h) a court enters as judgment against a Debtor or non-Debtor affiliate one or more final judgments or orders for the payment of money in an aggregate amount exceeding $2,000,000; <br><br>(i) an ERISA Event occurs which has resulted or could reasonably be expected to result in pension-related liability of any Debtor in excess of $25,000,000; <br><br>(j) any material provision of any DIP Document, at any time after its execution and delivery and for any reason other than as expressly permitted under the DIP Credit Agreement ceases to be in full force and effect or any Debtor or any other person contests the validity of any DIP Document; <br><br>(k) there occurs a Change in Control (as defined in the DIP Credit Agreement); <br><br>(l) the DIP Documents cease to create a valid and perfected lien on the collateral of |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| | the Debtors;<br><br>(m) these chapter 11 cases are dismissed or converted to a case under chapter 7 of the Bankruptcy Code;<br><br>(n) an application shall be filed by any Debtor for the approval of any Other Superpriority Claim (as defined in the DIP Credit Agreement), or an order of the Bankruptcy Court shall be entered granting any Other Superpriority Claim;<br><br>(o) The Bankruptcy Court or a Canadian court shall enter an order permitting a third party to proceed on assets of the Debtors having a value in excess of $2,000,000 or permit any other actions having a Material Adverse Effect (as defined in the DIP Credit Agreement) on the Debtors;<br><br>(p) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying for a period of seven days or more, vacating or otherwise amending, supplementing or modifying the Interim or Final Order;<br><br>(q) Except as permitted by the DIP Orders or agreed to by the DIP Agent and the Required Lenders, any Debtor shall make any Pre-Petition Payment (as defined in the DIP Credit Agreement) other than those authorized by the Bankruptcy Court;<br><br>(r) entry of an order confirming (or the filing of any motion or pleading requesting confirmation of) a plan of reorganization with respect to any Debtor other than a plan of reorganization that will pay obligations arising under the DIP Facility in full;<br><br>(s) Any Debtor or subsidiary shall take any action in support of any matter set forth in clauses (m) through (r) above;<br><br>(t) any of the Debtors seek to challenge the validity or enforceability of the obligations arising under the DIP Facility.<br><br>(u) termination or expiration of the exclusivity period;<br><br>(v) noncompliance of the Debtors or their non-Debtor subsidiaries with the DIP Orders;<br><br>(w) termination of the RSA; and<br><br>(x) Any Debtor attempts to amend or modify the Canadian Recognition Order.<br><br>*See* DIP Credit Agreement § 8.01. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to enforce all of their rights under the DIP Documents, subject to certain conditions and the defined rights of the Debtors to seek re-imposition of the automatic stay.<br><br>*See* Interim Order ¶ 9. |

| Bankruptcy Code | Summary of Material Terms/Significant Provisions Governed by Rule 3(c)(vii) |
|---|---|
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | Whether or not the DIP Agent, on behalf of the DIP Lenders or the Prepetition Lenders shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any cash or securities, notate its name as secured party on any certificates of title for a titled good, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order. *See* Interim Order ¶ 14. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify the DIP Agent and each DIP Lender and certain related parties (each, an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Debtor arising out of, in connection with, or as a result of entry into the DIP Facility and certain other actions described more fully in the DIP Credit Agreement. *See* DIP Credit Agreement § 10.04. |
| **Liens on Avoidance Actions** | Subject to entry of the Final Order, the liens granted to the DIP Lenders shall attach to Avoidance Proceeds (relevant provisions quoted above). *See* Interim Order ¶¶ 7, 8. |

## Statement Regarding Significant Provisions

9.      The Interim Order contains certain of the provisions (the "<u>Significant Provisions</u>")[6] identified on Exhibit B to the Complex Case Procedures as summarized in the Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral attached hereto as **Exhibit D**.

10.      The Interim Order:  (a) binds the estate or any parties in interest with respect to the validity, perfection, or amount of a secured creditor's prepetition lien or debt or the waiver of

---

[6]      Significant Provisions refer to those provisions that:  (a) grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors; (b) deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code; (c) bind the bankruptcy estates or any parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor; (d) waive or limit the estate's rights under section 506(c) of the bankruptcy code; (e) grant prepetition secured creditors liens on the debtor's claims and causes of action arising under chapter 5 of the Bankruptcy Code; (f) impose deadlines for the filing of a plan or disclosure statement; and (g) grant an administrative claim.

claims against the secured creditor (subject to certain challenge rights); (b) subject to entry of the Final Order, waives the Debtors' rights under section 506(c) of the Bankruptcy Code; (c) subject to entry of the Final Order, grants the DIP Lenders liens on the proceeds of the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code; and (d) grants administrative adequate protection claims.  In addition, the DIP Credit Agreement imposes certain chapter 11 milestones that correspond with the milestones set forth in the RSA—including imposing a deadline of 30 days after the Petition Date to file a chapter 11 plan and disclosure statement.  The Significant Provisions were necessary to secure the Prepetition Lenders' consent to the use of cash collateral under the Interim Order and grant of priming liens under the DIP Documents— and, more broadly, the enterprise-saving concessions contained in the RSA.  The DIP Facility is critical piece of the comprehensive restructuring transaction contemplated by the RSA.

11.     In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases.  Accordingly, the Significant Provisions in the Interim Order should be approved.

## Jurisdiction and Venue

12.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

13.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases (the "Complex Case Procedures").

**Background**

I.     **The Debtors' Prepetition Capital Structure.**

15.     As of the Petition Date, the Debtors and certain of their non-Debtor affiliates, were liable for approximately $1.38 billion in aggregate debt obligations.  Debtor C&J Energy Services, Inc. is also liable for an aggregate of approximately $33 million outstanding under certain capital leases.  C&J's prepetition capital structure is summarized as follows:

| Debt | Maturity | Principal Amount |
|------|----------|------------------|
| Revolver | March 24, 2020 | $300 million |
| Term Loan B-1 | March 24, 2020 | $569 million |
| Term Loan B-2 | March 24, 2022 | $480 million |
| Capital Leases | Variable | $33 million |
| | **Total:** | $1,382 million |

A.     **The Prepetition Credit Agreement.**

16.     Certain of the C&J entities executed that certain Credit Agreement (*i.e.*, the Prepetition Credit Agreement), dated as of March 24, 2015, by and between C&J Energy, C&J Energy subsidiary CJ Lux Holdings S.à.r.l., U.S. HoldCo, the Prepetition Lenders, and Cortland Capital Market Services LLC, as successor administrative agent (*i.e.*, the Prepetition Agent). The Prepetition Credit Agreement originally provided for two senior secured credit facilities in an aggregate amount of $1.66 billion, consisting of:  (a) a revolving credit facility with a maximum availability of $600 million (the "Revolver"); and (b) a term loan B credit facility in the aggregate principal amount of $1.06 billion (the "Term Loan").  The Prepetition Credit Agreement contains certain financial covenants applicable to both the Revolver and Term Loan, including a Total Leverage Ratio, Interest Coverage Ratio, and Minimum Cumulative Consolidated EBITDA (each as defined in the Prepetition Credit Agreement).  Obligations under the Prepetition Credit Agreement are guaranteed by each of the Debtors and certain of their non-Debtor affiliates.  As is relevant here, obligations under the Prepetition Credit Agreement are

secured on a *pari passu*, first-lien basis by substantially all of the Debtors' assets, including cash held in controlled depository accounts.

17.     **Revolver:**   In connection with certain amendments to, and waivers under, the Credit Agreement, as of the Petition Date, the aggregate commitments under the Revolver have been limited to $300 million.   As of the Petition Date, approximately $300 million remains outstanding under the Revolver, which amount includes $15.14 million in outstanding letters of credit.

18.     **Term Loan:**  The Term Loan is comprised of two tranches:  a tranche consisting of term loans maturing on March 24, 2020 ("Term Loan B-1") and a second tranche consisting of term loans on substantially identical terms but maturing on March 24, 2022 ("Term Loan B-2").  As of the Petition Date, approximately $569 million in principal remained outstanding under Term Loan B-1 and approximately $480 million in principal remained outstanding under Term Loan B-2, for an aggregate outstanding principal balance under the Term Loan of approximately $1.05 billion.

19.     In addition to the principal amounts outstanding under the Revolver and the Term Loan, interest and fees (including letter of credit fees and unused commitment fees) have gone unpaid and been accruing since prior to May 31, 2016, when the Debtors, the Administrative Agent, and certain of the Lenders entered into the Forbearance Agreement (as defined in the First Day Declaration).

**B.       The Capital Leases.**

20.     In 2013, C&J entered into certain "build-to-suit" lease agreements for the construction of a new, technology-focused research and development facility and a new corporate office.   Each lease is accounted for as a capital lease (collectively, the "Capital

Leases"). As of the Petition Date approximately $33 million remained outstanding under the Capital Leases. Debtor C&J Energy Services, Inc. is the obligor under the Capital Leases.

## II.   The Debtors Have an Immediate Need for Debtor-in-Possession Financing.

21.    The Debtors require immediate access to liquidity to ensure that they are able to continue operating during these chapter 11 cases and preserve the value of their estates for the benefit of all parties in interest. As of the Petition Date, the Debtors' total cash balance is approximately $43.9 million and they do not have readily available sources of additional financing.[7] Significantly, due to the volatile nature of industry in which C&J operates, C&J has historically attempted to maintain a balance of approximately $25 million in cash on hand to preserve the flexibility to react to revenue swings. Based on the forecasts and extensive analysis of C&J's management team and advisors, the Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs and the projected costs of these chapter 11 cases without debtor-in-possession financing. Thus, securing debtor-in-possession financing at the start of these chapter 11 cases is crucial to the Debtors' continued viability.

22.    The DIP Facility provides the Debtors with immediate access to the liquidity necessary to stabilize the Debtors' businesses during the pendency of these chapter 11 cases and ensure that the value-maximizing transaction contemplated by the RSA is consummated. The DIP Facility along with continued access to the Cash Collateral will provide the Debtors with enough liquidity to facilitate the administration of these chapter 11 cases, fund all payments contemplated by the First Day Motions described herein, and position the Debtors with sufficient capital to operate their businesses upon emergence. As described above, the Debtors require

---

[7]    Two additional non-Debtor captive insurance companies have aggregate cash in the amount of approximately $21 million that cannot be accessed without potentially adverse tax consequences.

immediate access to the initial $25 million draw under the DIP Facility to provide comfort to their customer base—including those customers concerned with potential Mineral Contractor liens—and stabilize operations enterprise wide.  Accordingly, the amount of the DIP Facility is appropriate and justified in light of the Debtors' businesses and their liquidity needs, and will inure to the benefit of the Debtors' estates, their stakeholders, and stakeholders on an enterprise-wide basis

### III.    Alternative Sources of Financing Are Not Available.

23.    The DIP Facility is an integrated piece of the global compromise embodied in the RSA and, by its own terms, cannot be separated from the RSA to fund any restructuring process other than the process contemplated by the RSA.  Significantly, the Debtors and Steering Committee agreed to amend the RSA prior to the Petition Date to allow non-Steering Committee Prepetition Lenders that become signatories to the RSA to participate in up to 40 percent of the DIP Facility.

24.    In addition to the Debtors' broader restructuring negotiations, the Debtors' investment banker, Evercore Group LLC ("Evercore"), conducted a marketing process to determine the availability of other funding sources.  Evercore ultimately contacted eight financial institutions that Evercore determined could have the interest and financial wherewithal to fund a debtor-in-possession financing facility the size of the DIP Facility.  Each of the financial institutions rejected the opportunity to provide alternative debtor-in-possession financing out-of-hand.  In light of the Debtors' approximately $1.4 billion in secured obligations under the Prepetition Credit Agreement—and the fact that the Steering Committee had expressed both its interest in providing debtor-in-possession financing and its objection to any "priming" debtor-in-possession financing third-party—no financial institution that Evercore contacted was interested in providing junior debtor-in-possession financing or investing the time and cost necessary to

provide debtor-in-possession financing on a non-consensual, priming basis.  Accordingly, based on the results of this marketing process, I do not believe that alternative debtor-in-possession financing on terms superior to those contained in the DIP Facility is presently available to the Debtors.

25.     The RSA is the product of extensive good-faith, arm's-length negotiations, and the DIP Facility an essential component of a broader restructuring transaction contemplated by the RSA.  As a result, and in light of the foregoing, alternative sources of financing with terms as favorable as those of the DIP Facility are not available to the Debtors—significantly, the DIP Facility represents the only viable financing available that has garnered the support of a supermajority of Prepetition Lenders.  The economic terms of the proposed DIP Facility are competitive and reflective of the market for other similar postpetition financing in recent years. Accordingly, approval of the DIP Facility is in the best interests of the Debtors' estates and that the Court should approve the DIP Facility on the terms and conditions described herein and as set forth in the Interim Order.

## IV.     The Nabors Proposals.

26.     As described in the First Day Declaration, in the midst of the Debtors' restructuring negotiations, the Debtors received a series of restructuring proposals from their majority shareholder, Nabors Industries Ltd. ("Nabors").  The initial Nabors proposals resembled the Prepetition Lender proposals—tracking the transaction structure ultimately adopted in the RSA—but provided for Nabors' participation and certain variations of the economic terms. The most recent Nabors proposals, however, contemplated a truncated sale process pursuant to section 363 of the Bankruptcy Code.  While the Nabors section 363 sale proposal also referenced "junior" debtor-in-possession financing (*i.e.*, not secured by priming liens, but by liens on

unencumbered assets), such financing was junior in name only as the proposal contemplated that the loans arising thereunder would be accorded superpriority administrative status.

27.     While they may have contemplated similar post-reorganization balance sheets for the Debtors, there were at least two significant, categorical differences between the proposals from the Steering Committee and from Nabors.  **First**, the Steering Committee proposals were each delivered with the consent and support of a significant contingent of the Prepetition Lenders, whereas the Nabors proposals, though conditioned on the willingness of Prepetition Lenders to equitize their debt, did not provide any meaningful path to obtaining such necessary Lender support.  **Second**, while the Steering Committee proposals contemplated significant governance rights for the Prepetition Lenders equitizing their debt, the Nabors proposals largely sought to put control of C&J and its Board in the hands of Nabors.

28.     Proceeding with the Nabors-backed section 363 sale process would likely have involved securing approval of a debtor-in-possession financing facility over the objection of the Prepetition Lenders.   Further, the superpriority administrative claim debtor-in-possession financing contemplated by the last Nabors section 363 proposal—aside from likely encountering significant opposition from the Prepetition Lenders—is not truly "junior" because it would have to be paid in full under any chapter 11 plan, thus creating an obstacle to the Debtors' emergence from chapter 11.  Perhaps more to the point, the Debtors run the risk of running out of cash postpetition under the Nabors section 363 sale proposal since, based on the analysis of the Debtors' management team and advisors, the amount of debtor-in-possession financing contemplated thereby—even if it were truly on a junior basis—was insufficient to fund a non-consensual chapter 11 process.

29.     Finally, in light of the outstanding secured obligations under the Prepetition Credit Agreement, each of Nabors' restructuring proposals would have been unworkable as a practical matter absent the requisite Prepetition Lenders' consent—which was not forthcoming. The early Nabors proposals contemplated equitization of some or all of the obligations arising under the Prepetition Credit Agreement.  Similarly, Nabors' section 363-based proposal was not viable unless the proposed sale would pay in full, in cash all amounts outstanding under the Prepetition Credit Agreement—which it did not even purport to do.  While Nabors' section 363-based proposal included a small cash component, the cash total was much less than the $1.4 billion the Prepetition Lenders are owed.

30.     Substantially all of the Nabors proposals, such as they were, came in the form of undeveloped, single page "term sheets" or short letters addressed to the Debtors' board of directors (the "Board") or the special restructuring committee of the Board and were presented only minutes before a scheduled Board meeting was to occur.  It came as no surprise, then, when the Board received another "proposal" from Nabors on the eve of the Debtors' chapter 11 filing. While the latest Nabors proposal purported to allow the Debtors to pursue either a sale process— as previously championed by Nabors—or a chapter 11 plan process, the proposal also provided Nabors with a consent right (*i.e.*, control) over any plan.  Further, as with its earlier proposals, Nabors' latest effort lacked substantially all the definitive documentation necessary to execute the proposed transaction.  Since the Debtors forbearance agreement with the Prepetition Lenders was set to expire at 11:59 p.m. prevailing Eastern Time on the Petition Date, the Debtors' choices were to proceed in a "free fall" fashion with the Nabors transaction, which the Prepetition Lenders would actively oppose, or proceed with the fully-baked resolution embodied in the RSA that contains a full fiduciary out.  The Debtors chose the latter.

31.     Further, the proposed Nabors debtor-in-possession financing, while purportedly junior:  (a) required weekly cash sweeps of all amounts above $8 million (*i.e.*, using the Cash Collateral to pay Nabors' outstanding DIP exposure); (b) required that all claims arising thereunder be treated as superpriority administrative expenses; and (c) otherwise contained an onerous financial covenant that triggered an event of default if the Debtors missed any budget line item by five percent or more.  In addition, while the proposed financing did not provide for any payment of adequate protection other than junior replacement liens on the unencumbered assets and junior superpriority claims, it is highly unlikely that the Prepetition Lenders would have supported the foregoing provisions, which have the effect of priming the Prepetition Lenders or otherwise create an impediment to the Debtors' emergence from chapter 11.  In other words, the eve-of-filing Nabors proposal is just as unworkable as its prior proposals.

## Basis for Relief

I.      **The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.**

   A.      **Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

32.     The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See*, *e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*,

24

115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

33.     Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

34.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

35.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their sound business judgment following a thorough process and careful evaluation of alternatives.  Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support the administration of their chapter 11 cases and their ongoing operations.  The Debtors negotiated the DIP Credit Agreement and other DIP

Documents with the DIP Lenders in good faith, at arms' length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available.  The Debtors further believe that the terms of the DIP Facility are reflective of the market for financings of this type.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as it is a reasonable exercise of the Debtors' business judgment.

> **B.**     **The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

36.     The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code. Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors' assets, including previously unencumbered property and "priming" liens on all of the Prepetition Collateral.

37.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

      a.      the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

      b.      the credit transaction is necessary to preserve the assets of the estate; and

      c.      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

      38.     No party that Evercore contacted as part of the above-described process was interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured non-superpriority basis.  As described above, even the Nabors debtor-in-possession financing proposals, while purportedly junior, contemplated superpriority administrative expense claims and a sweep on the Debtors cash that, in effect, primed the Prepetition Lenders' securing interest in the Debtors' cash.  Given the Debtors' operational difficulties, highly-leveraged balance sheet, and uncertain amount of unencumbered assets, the Debtors were unable to solicit any viable proposals that would provide debtor-in-possession financing on an unsecured or administrative expense basis.  Put simply, the DIP Lenders will not fund the DIP Facility on any other terms and no other existing stakeholder or third-party has presented a viable debtor-in-possession financing proposal.  Further, the Debtors have not received an actionable or viable debtor-in-possession financing proposal that would only be secured by liens on unencumbered assets.  Finally, the DIP Facility is an integrated component of the comprehensive restructuring contemplated by the RSA—the only viable restructuring alternative available to the Debtors.  Accordingly, the DIP Facility's structure is appropriate in light of the Debtors' financing needs and the lack of viable debtor-in-possession financing alternatives.

39.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See, e.g.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Lenders have consented or (b) the Prepetition Lenders' interests in collateral are adequately protected.  Here, the requisite Prepetition Lenders are party to the RSA and thus have consented to the DIP Orders.  Further, the Prepetition Lenders will receive adequate protection of the Prepetition Collateral under the DIP Orders, as described further below.  Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

## C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

40.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive

search for financing." *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

41.    As noted above, alternative sources of debtor-in-possession financing are not reasonably available to the Debtors.  Substantially all of the Debtors' assets are encumbered under their existing capital structure—which includes approximately $1.4 billion in secured funded-debt obligations—greatly reducing the likelihood that a non-Prepetition Lender constituency could propose a viable debtor-in-possession financing alternative.  The Debtors have determined that the DIP Facility is the best available alternative under the circumstances to both fund these chapter 11 cases and provide a clear path toward the confirmation and consummation of the chapter 11 plan contemplated by the RSA.  Accordingly, the Court should approve the Debtors' entry into the DIP Facility.

## II.    The Debtors Should Be Authorized to Use the Cash Collateral.

42.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Specifically, section 363(c)(2)(A)  of the Bankruptcy Code permits a debtor to use cash collateral with the consent of the secured party.  Here, the Prepetition Lenders party to the RSA have consented to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

43.    In addition, section 363 provides for adequate protection of interests in property—for example, the Prepetition Lenders' security interest in the Prepetition Collateral, including the Cash Collateral—when a debtor uses or otherwise encumbers such property.  *See* 11 U.S.C. §§ 363(e), 364(d)(1);  *See also In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

44.    As set forth in the Interim Order, the Debtors propose to provide the Prepetition Lenders with adequate protection to protect against the postpetition diminution in value of the Prepetition Collateral resulting from the use, sale, or lease of such collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations"), including:  replacement liens and superpriority administrative claims to the extent of diminution in value, payment of the Prepetition Agent's professionals' fees, performance of certain milestones set forth in the DIP Credit Agreement, and certain reporting obligations. Significantly, the Prepetition Lenders have not requested adequate protection in the form of cash

payment, a substantial concession that will allow the Debtors to conserve liquidity as the depressed market conditions persist.

45.     The Debtors submit, and the Prepetition Lenders party to the RSA agree, that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Lenders from any diminution in value to the Cash Collateral and are appropriate under the circumstances. Accordingly, the Court should approve the terms of the Debtors' postpetition use of the Cash Collateral.

**III.    The Debtors Should Be Authorized to Pay the Interest Fees Required by the DIP Agent and the DIP Lenders under the DIP Documents.**

46.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay:

a.    ***Interest Rate:***  The loans under the DIP Facility will bear interest, at the option of the Debtors, at one of the following rates:  (i) the Base Rate (as defined in the DIP Credit Agreement) plus the applicable margin of 8.00%; or (ii) the Eurocurrency Rate (as defined in the DIP Credit Agreement) plus the applicable margin of 9.00% (subject to a 1% LIBOR floor).  During the continuance of a payment event of default under the DIP Documents, overdue amounts will bear interest at an additional two percent per annum.

b.    ***Unused Commitment Fee***.  The Debtors shall pay to the DIP Agent for the account of each DIP Lender, an unused commitment fee in Dollars equal to 5.00% per annum times the actual daily amount of the aggregate unused commitments under the DIP Facility.  The unused commitment fee shall accrue at all times during the availability period and shall be due and payable monthly in arrears on the last business day of each month and on the last day of the availability period.

c.    ***Administrative Agent Fees.***  The Debtors shall pay to the DIP Agent for its own account, in cash, an administrative fee in the amount of $50,000 and, without duplication of amounts paid pursuant to the Credit Agreement, the reasonable and documented out-of-pocket fees and expenses of the Administrative Agent.

d.   ***Original Issue Discount.***  The Debtors shall pay for the account of each DIP Lender, an original issue discount equal to 2.00% of the aggregate principal amount of the commitments under the DIP Facility, which original issue discount shall be earned, due and payable on the effective date of the DIP Credit Agreement and calculated by multiplying 2.00% by the aggregate principal amount of commitments under the DIP Facility on the effective date of the DIP Credit Agreement.

47.   As set forth in the Hannan Declaration, the Debtors believe that the interest and fees to be paid under the DIP Facility are consistent with the market and are reasonable, consistent with the market, appropriate, particularly in light of the circumstances of these chapter 11 cases, and represent the most favorable terms available to the Debtors.  Further, the above-described fees are relatively minor in comparison to the Debtors' overall capital structure—*i.e.*, the nearly $1.4 billion that will be equitized in accordance with the terms of the RSA.  The Debtors considered the fees described above when determining in their sound business judgment that the DIP Facility constituted the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute their cases. Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

**IV.   The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e).**

48.   Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal,

unless such authorization and the incurring of such debt, or the
granting of such priority or lien, were stayed pending appeal.

49.     The DIP Facility is the result of (i) the Debtors' reasonable and informed
determination that the DIP Lenders offered the most favorable terms on which to obtain vital
postpetition financing, and (ii) extensive arm's-length, good-faith negotiations between the
Debtors and the Prepetition Lenders.  The Debtors submit that the terms and conditions of the
DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP
Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further,
no consideration is being provided to the DIP Agent, the DIP Lenders, or any other party to the
DIP Documents other than as described herein.  Accordingly, the Court should find that the
obligations arising under the DIP Facility and other financial accommodations made to the
Debtors have been extended by the DIP Agent and the DIP Lenders in "good faith" within the
meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Agent and the DIP
Lenders are entitled to all of the protections afforded thereby.

**V.     The Automatic Stay Should Be Modified on a Limited Basis.**

50.     The Interim Order provides that the automatic stay provisions of section 362 of
the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements,
security agreements, notices of liens, and other similar instruments and documents in order to
validate and perfect the liens and security interests granted to them under the Interim Order.  The
proposed Interim Order further provides that the automatic stay is modified as necessary to
permit the Debtors to grant the liens described herein to the DIP Lenders and to incur all
liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order
provides that the automatic stay shall be vacated and modified, subject to certain limitations, to

the extent necessary to permit the DIP Agent and DIP Lenders to exercise certain remedies in the event of a default by the Debtors under the DIP Documents.

51.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (same); *In re ATP Oil and Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 17, 2012) (same); *In re MPF Holdings US LLC*, No. 08-36084 (JB) (Bankr. S.D. Tex. Feb. 18, 2009) (same); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (same); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

### VI.     Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

52.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

53.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive the Initial Borrowing under the DIP Facility.  The Debtors require

34

access to the DIP Facility prior to the Final Hearing and entry of the Final Order to continue operating, pay their administrative expenses, to implement the relief requested in the Debtors' other "first day" motions, and otherwise effectuate the restructuring contemplated by the RSA. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## Request for Final Hearing

54.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## Emergency Consideration

55.     In accordance with Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." Here, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

56.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

57.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) Davis Polk & Wardwell LLP and Diamond McCarthy LLP as counsel to Cortland Capital Market Services LLC as administrative agent under the Debtors' secured credit agreement and agent for the proposed debtor-in-possession financing facility; (d) Nabors Industries Ltd. and counsel thereto; (e) the United States Attorney's Office for the Southern District of Texas; (f) the Internal Revenue Service; (g) the Environmental Protection Agency; (h) the office of the attorneys general for the states in which the Debtors operate; (i) the Securities and Exchange Commission; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.

## No Prior Request

58.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

[*Remainder of page intentionally left blank*]

Dated:  July 20, 2016             /s/ *Stephen Thomas Schwarzbach*

Stephen Thomas Schwarzbach Jr. (Texas Bar No. 24079288)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
600 Travis Street
Suite 3300
Houston, Texas 77002
Telephone:      (713) 835-3600
Facsimile:      (713) 835-3601
Email:          steve.schwarzbach@kirkland.com

- and -

James H.M. Sprayregen, P.C.
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Chad J. Husnick (*pro hac vice* admission pending)
Emily E. Geier (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
                marc.kieselstein@kirkland.com
                chad.husnick@kirkland.com
                emily.geier@kirkland.com

- and -

Bernard Given II (Texas Bar No. 07990180)
Lance Jurich (*pro hac vice* admission pending)
**LOEB & LOEB LLP**
10100 Santa Monica Boulevard
Suite 2200
Los Angeles, California 90067
Telephone:      (310) 282-2000
Facsimile:      (310) 282-2200
Email:          bgiven@loeb.com
                ljurich@loeb.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on July 20, 2016, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Stephen Thomas Schwarzbach Jr.*
One of Counsel