**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| CJ HOLDING CO., *et al.*,[1] | § | Case No. 16-33590 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | (Emergency Hearing Requested) |

**DECLARATION OF MARK CASHIOLA IN SUPPORT OF**
**THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Mark Cashiola, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer ("CFO") of C&J Energy Services Ltd.

("C&J Energy"), a publicly-traded "exempted company" organized under the laws of Bermuda

and a debtor and debtor in possession in the above-captioned chapter 11 cases of CJ Holding Co.

("U.S. HoldCo") and its affiliates as debtors and debtors in possession (collectively,

the "Debtors," and together with their non-Debtor affiliates, collectively, "C&J").  C&J Energy

is the ultimate parent company of each of the Debtors.  I have served as C&J Energy's CFO

since June 2016, having previously served as Vice President, Controller, and Chief Accounting

Officer since January 2011.

2.      I am generally familiar with the Debtors' day-to-day operations, business and

financial affairs, and books and records.  I submit this declaration (this "Declaration") to assist

the  Court  and  parties  in  interest  in  understanding  the  circumstances  that  compelled  the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number (if any), are:  CJ Holding Co. (4586); Blue Ribbon Technology Inc. (6338); C&J Corporate Services
(Bermuda) Ltd.; C&J Energy Production Services-Canada Ltd.; C&J Energy Services, Inc. (3219); C&J Energy
Services Ltd.; C&J Spec-Rent Services, Inc. (0712); C&J VLC, LLC (9989); C&J Well Services Inc. (5684);
ESP Completion Technologies LLC (4615); KVS Transportation, Inc. (2415); Mobile Data Technologies Ltd.;
Tellus Oilfield Inc. (2657); Tiger Cased Hole Services Inc. (7783); and Total E&S, Inc. (5351).  The location of
the Debtors' service address is 3990 Rogerdale, Houston, Texas 77042.

commencement of these chapter 11 cases and in support of: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date"); and (b) the emergency relief that the Debtors have requested pursuant to the motions described herein (collectively, the "First Day Motions").

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

## **INTRODUCTION**

4.      Over the course of the past nearly two years, the domestic oil and gas industry— in particular the exploration and production ("E&P") space—has been devastated by a severe, prolonged downturn in commodities prices. The result has been dozens of large E&P company chapter 11 filings in recent months. The distress that has enveloped the E&P sector has spread beyond to service providers and other ancillary businesses that depend on E&P companies for their livelihood. C&J is one such business.

5.      Against this exceedingly challenging market backdrop, however, C&J has managed to negotiate a consensual resolution with the holders (the "Lenders") of approximately 83 percent of the nearly $1.4 billion in obligations outstanding under C&J's prepetition credit agreement (the "Credit Agreement"). The terms of this resolution are set forth in the restructuring support agreement, dated as of July 8, 2016, a copy of which is attached hereto as **Exhibit A** (as amended from time to time and including all exhibits thereto, the "RSA"). The

transactions contemplated by the RSA will result in a **_total_** deleveraging of C&J's balance sheet—all amounts owing under the Credit Agreement will be equitized—and provide substantial post-emergence liquidity in the form of a $200 million rights offering (the "Rights Offering"), backstopped by certain of the Lenders.  Certain of the Lenders have also agreed, subject to the Court's approval, to provide a $100 million debtor-in-possession credit facility (the "Proposed DIP Financing") to fund the administration of these chapter 11 cases.  Upon consummation of the restructuring contemplated by the RSA, the Debtors will be well-positioned to both weather the industry storm and capitalize on their attractive operating footprint and established reputation for quality service as the market rebounds.

6.     To capture the full benefit of the compromises embodied in the RSA, the Debtors must move swiftly through chapter 11.  The supporting Lenders' commitments to equitize their claims of nearly $1.4 billion under the Credit Agreement and facilitate the Debtors emergence by backstopping the lifeblood Rights Offering are contingent on the Debtors' executing their restructuring in accordance with certain milestones (the "Milestones") defined in the RSA. Under the Milestones, the Debtors must confirm a chapter 11 plan of reorganization with 130 days after the Petition Date and emerge from bankruptcy within 21 days thereafter.  The Debtors, cognizant of the turbulent operating backdrop, are prepared to consummate their restructuring in accordance with the Milestones and thereby maximize the value of the entire C&J enterprise.

*     *     *     *     *

7.     C&J is an oilfield services company that offers a range of completion and production related services necessary to, for example, prepare drilled oil and gas wells for extraction, stimulate well production, and maintain producing wells.  Substantially all of C&J's customers are E&P companies and therefore C&J's success is directly tied to the success of its

3

E&P company customer base.  The success of C&J's E&P company customer base is directly tied to commodities prices.  Thus, demand for C&J's services tends to be as volatile and cyclical as the commodities markets themselves.  In response to the recent low commodity pricing environment, E&P companies have significantly reduced capital expenditures—*i.e.*, E&P companies have stopped drilling and completing new oil and gas wells—greatly reducing demand for the types of services C&J provides.

8.      Further, E&P sector capital expenditures, and thus the demand for C&J's services, are influenced as much by market ***expectations*** as actual market performance.  In other words, E&P sector capital expenditure levels are unlikely to improve if E&P companies expect continued volatility in the commodities markets.  Commodities markets have experienced and are continuing to experience a nearly unprecedented level of volatility, with no sure sign of calm on the horizon.  Thus, unlike its E&P company customers, C&J did not receive a direct boost from the recent oil and gas price increases.  To top it off, C&J operates in a highly-competitive industry, where its larger, more geographically diversified, and often better-capitalized competitors are in a position to exert significant, downward pressure on pricing for services. C&J's operations span the continental United States and Western Canada, with its U.S.-based operations accounting for nearly all enterprise-wide revenue—these markets have been uniformly hit hard by recent depressed commodities prices.

9.      The foregoing circumstances have significantly strained C&J's enterprise-wide liquidity, especially in light of the fact that C&J incurred more than $1 billion in funded-debt obligations in connection with an early-2015 merger transaction (the "Merger") that nearly tripled the size of its enterprise-wide operations.  Under the prevailing market conditions since that time, C&J's capital structure has simply become unsustainable.  In response, over the course

4

of 2015 through the first half of 2016, C&J implemented various operational "right-sizing" measures, coupled with severe cost-cutting measures, in an attempt to mitigate the liquidity strain brought on by significantly reduced activity in the E&P sector. Due to market conditions, C&J has yet to realize the full benefits expected from the Merger.

10.     As market conditions hit rock bottom in early 2016, it became clear that C&J would not likely be able to maintain compliance with certain financial covenants under the Credit Agreement. Accordingly, over the course of the first half of 2016, C&J engaged its key stakeholders—including a steering committee of Lenders (the "Steering Committee")—regarding comprehensive restructuring alternatives that would strengthen C&J's balance sheet and provide near-term liquidity support. With the support of the Steering Committee, C&J was ultimately able to secure several months' worth of forbearance from the Lenders—time it used to engage both existing stakeholders and third parties regarding restructuring alternatives.

11.     After extensive, hard-fought negotiations, the Debtors and the Steering Committee agreed to the terms of the RSA. In the months immediately preceding the Petition Date, the Debtors explored various leverage points with the Steering Committee, including considering third-party proposals, and arrived at a resolution under which the Lenders agreed to significant concessions and financial support, including, among other things, a full restructuring of the obligations under the Credit Agreement and facilitating a $200 million new-money equity investment. Significantly, a special committee consisting of disinterested directors considered and unanimously recommended entry into the RSA to C&J's full board of directors (the "Board") as the value-maximizing alternative, and the Board subsequently authorized such action after intensive deliberations. In accordance with the RSA and following additional

authorizations from the Board, on the Petition Date, the Debtors commenced these chapter 11 cases.

12.     The RSA is a significant achievement for the Debtors in the face of extremely challenging operating conditions over the past eighteen months.  Further, in spite of these prevailing market conditions, C&J maintains an attractive asset and customer base, an established reputation for the highest level of customer service and operational performance, and an operating footprint that encompasses nearly all of the continental United States' most significant and prolific resource plays, including the Eagle Ford shale in South Texas and the Permian Basin in West Texas.  In light of these core strengths, the Debtors are confident that they can implement the RSA's balance sheet restructuring to ensure C&J's long-term viability.

13.     To familiarize the Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this declaration as follows:  part one provides a general overview of C&J's corporate structure and business operations;  part two describes C&J's prepetition capital structure; part three describes the circumstances leading to these chapter 11 cases; part four describes the parallel Bermudian and Canadian insolvency proceedings; part five describes the Debtors' proposed timeline for these chapter 11 cases;  and part six sets forth the evidentiary basis for the relief requested in each of the First Day Motions.

## BACKGROUND

### I.     C&J's Corporate History.

14.     C&J Energy's predecessor in interest, C&J Energy Services, Inc. ("Legacy C&J"), was founded by Josh Comstock as a two-employee pressure pumping operation in Corpus Christi, Texas in 1997.  Over the course of the past two decades, C&J has grown into one of the largest, integrated oilfield services companies in North America—fueled by both organic

6

and acquisition-based growth.  In 2011, Legacy C&J completed its initial public offering and began trading on the New York Stock Exchange (the "NYSE") under the ticker symbol "CJES." Mr. Comstock served as C&J's CEO and chairman of the board of directors from Legacy C&J's founding until his unexpected death in March 2016.  Mr. Comstock was the engine behind C&J's growth over the course of the past twenty years and architect of the transformative Merger transaction described below.  C&J's untiring commitment to top-tier customer service and best-in-class efficiency in execution is a direct reflection of the ideals upon which Mr. Comstock built the company.

15.     On March 24, 2015, Legacy C&J completed the Merger with the completion and production services business (the "C&P Business") of Nabors Industries Ltd. ("Nabors"). Nabors is one of the world's largest oil and gas drilling contractors—the C&P Business represented only a portion of Nabors' pre-Merger operations, separate from its core drilling services operations (which were not affected by the Merger).  In brief, under the terms of the Merger, Nabors separated the C&P Business from the rest of its operations and consolidated this business under a wholly-owned subsidiary named "Nabors Red Lion Limited" ("Red Lion"), a Bermuda exempted company.    A U.S.-based, wholly-owned subsidiary of Red Lion then merged with and into Legacy C&J, with Legacy C&J continuing as the surviving entity.  Upon completion of the Merger, the common shares of Legacy C&J were converted into common shares of Red Lion on a 1-for-1 basis and Red Lion was renamed "C&J Energy Services Ltd." (*i.e.*, C&J Energy).  C&J Energy's post-Merger common shares have continued to trade on the NYSE under Legacy C&J's pre-Merger ticker symbol, CJES.

16.     In exchange for the C&P Business, Nabors received consideration in the form of cash and post-Merger C&J Energy common shares.  Upon closing of the Merger, Nabors owned

approximately 53 percent of C&J Energy's common shares on a pre-dilution basis, with Legacy

C&J equityholders owning the balance of the shares.  As a result of the Merger, Legacy C&J's

employee headcount increased from 3,397 to 9,168 upon the closing of the Merger.  C&J's post-

Merger management was primarily comprised of Legacy C&J's executive officers and a majority

of C&J's post-merger board seats were held by Legacy C&J board members.  As a result of the

Merger, Legacy C&J significantly expanded its North American footprint—including into

previously-untapped geographic locales in California and Western Canada—as depicted in the

following graphic:

**Post-Merger Operating Footprint**



17.     Generally speaking, the Legacy C&J operations and the C&P Business's

U.S.-based operations are organized under U.S. HoldCo.  U.S. HoldCo and each of its wholly-

owned, U.S.-based, operating subsidiaries are Debtors in these chapter 11 cases.  U.S. HoldCo

also holds interests in certain non-operating entities, joint ventures, and foreign entities that are not Debtors in these chapter 11 cases.  The C&P Business's Canadian operations are organized under certain of U.S. HoldCo's Canada-based affiliates (the "Canadian Debtors").  Each of the Canadian Debtors are wholly-owned subsidiaries of C&J Energy and are also Debtors in these chapter 11 cases.  As described below, the Canadian Debtors will commence ancillary proceedings in Canada to facilitate C&J's enterprise-wide restructuring.  Additionally, certain of U.S. HoldCo's Bermuda-based, non-operating affiliates, including C&J Energy (the "Bermudian Debtors"), are Debtors in these chapter 11 cases and, as described below, will likewise commence ancillary proceedings in Bermuda.  A simplified version of C&J's corporate structure[2] illustrating the C&J Debtor entities is as follows:



_____

[2]  Certain of the Debtors' non-Debtor affiliates are not pictured.  A chart depicting C&J's full prepetition organizational structure is attached hereto as **Exhibit B**.

18.     The rest of U.S. HoldCo's affiliates are non-operating entities organized under the laws of Bermuda, Luxembourg, Ireland, and the Netherlands (the "Non-Op Entities") or entities with only limited operations organized under the laws of certain Middle East countries (the "Middle East Entities") and Central American countries.  Neither the Non-Op Entities nor the Middle East Entities are the subject of insolvency proceedings (U.S.-based or otherwise).  C&J Energy is the ultimate parent company of each of the foregoing entities.  As of the Petition Date, Nabors owned approximately 52% of C&J Energy's outstanding common shares on a pre-dilution basis.

**II.     The Debtors' Key Assets and Operations.**

19.     The oil and gas industry is typically divided into three major sectors: "upstream," "midstream," and "downstream."  The upstream sector is comprised primarily of E&P companies that focus on locating and extracting crude oil and natural gas from the ground.  The midstream sector includes companies engaged in the gathering, transporting, and storing of hydrocarbons.  The downstream sector is comprised of the companies that carry out the distribution of the products derived from the extracted hydrocarbons to the ultimate end users.  Many upstream E&P companies do not complete the labor-intensive tasks of drilling, operating, and maintaining oil and natural gas wells themselves—instead opting to contract with oilfield services companies, like C&J, for the provision of such services.

20.     C&J provides a full range of well construction, well completion, well support, and other complementary oilfield services to oil and gas E&P companies, primarily in North America.  C&J operates in all of the major oil and gas producing regions of the continental United States and Western Canada.  In 2013, C&J expanded its operations into the Middle East but, as of the Petition Date, has established only minimal operations in the region.  For the year ended December 31, 2015, approximately 97.6 percent of C&J's consolidated revenues derived

from its U.S. operations, while approximately 2.3 percent derived from its Canada operations and approximately 0.1 percent derived from its Middle East operations.

21.     Overall, C&J's operations are primarily concentrated in Texas in the Eagle Ford and Permian Basin, two of the largest and most prolific oil and gas plays in the United States. The geographical spread of C&J's operations is depicted in the following graphic:

**Current Operating Footprint**



22.     C&J's results are driven by a number of interrelated factors, primarily:  (a) capital expenditures of its E&P company customer base (*i.e.*, the level of new drilling, completion, and production activity), which directly affects demand for C&J's services; (b) the price C&J is able to charge for its services, which is driven primarily by upstream demand and the equipment capacity in given geographic locale; (c) labor and supply costs and C&J's ability to pass such costs on to its customers; and (d) C&J's asset utilization rate.   C&J manages its operations

through three reportable segments—Completion Services, Well Support Services, and Other Services—each of which is described below.

23.    ***Completion Services:***  "Well completion" is a generic term used to describe the activities necessary to stimulate safe and efficient production from an oil or gas well after initial drilling operations have been completed.  C&J's Completion Services division grew significantly as a result of the Merger and includes more than 1.2 million hydraulic horsepower, more than 130 wireline units, and more than 40 coiled tubing units.  Well completion techniques and the type of equipment used in connection therewith varies from well-to-well and region-to-region depending on various factors.  For example, a well completion technique commonly employed in low-permeability shale plays is hydraulic fracturing, or "fracking," which involves injecting high volumes of fluid into the well site at high pressure to create cracks in shale formations through which oil or natural gas can flow.  The perfection of fracking technology was a driving force behind the boom in U.S. oil and gas production over the past two decades.  Hydraulic fracturing services accounts for the majority of the revenues derived from C&J's Completion Services segment.  Well completion services offered by C&J also include cased-hole wireline, coiled tubing, and other well stimulation services.  For the year ended December 31, 2015, C&J's Completion Services segment accounted for approximately 70% of enterprise-wide revenues.

24.    ***Well Support Services:***  C&J's Well Support Services segment was acquired as part of the Merger and consists primarily of two service lines:  rig services and fluid management services.  C&J's rig services line consists of a fleet of approximately 500 workover rigs. Workover services are designed to enhance the production of existing wells and include deepening or extending wellbores into new formations, sealing off depleted production zones, accessing previously bypassed production zones, and conducting subsurface repairs.  C&J also

uses its rig services fleet to complete comparatively less complex maintenance services and services in connection with E&P companies' state-law imposed plugging and abandonment obligations.   C&J's fluid management services line consists of approximately 1,450 fluid services trucks, approximately 5,250 frac tanks, and approximately 30 salt water disposal wells, which supply, store, remove, and dispose of specialized fluids utilized in well completion (*i.e.*, fracking) and workover operations.   For the year ended December 31, 2015, C&J's Well Support Services segment accounted for approximately 26% of enterprise-wide revenues.

25.   ***Other Services:***   C&J's Other Services segment is comprised of an amalgamation of C&J's smaller service lines and divisions.   These service lines and divisions include cementing services, directional drilling services, equipment manufacturing and repair, and C&J's Middle East operations.   This segment also includes C&J's research and technology division, through which C&J, among other things, manages its data acquisition and control instruments provider and its artificial lift applications provider.   For the year ended December 31, 2015, C&J's Other Services segment accounted for approximately 4% of enterprise-wide revenues.

26.   C&J serves a diverse group of independent and major national oil and gas E&P companies that are active in C&J's core areas of operations across the continental U.S. and Western Canada.   C&J generally offers the foregoing services to its customer base on a short-term, spot price (based on an agreed-upon hourly spot market rate for a specified number of hours of service), per job, or even per day basis.   C&J generally does not have long-term contractual arrangements in place with its customers.

## PREPETITION CAPITAL STRUCTURE

27.   As of the Petition Date, C&J Energy and certain of its subsidiaries, including the other Debtors, were liable for approximately $1.38 billion in aggregate debt obligations.   Debtor C&J Energy Services, Inc. is also liable for an aggregate of approximately $33 million

outstanding under certain capital leases. C&J's prepetition capital structure is summarized as follows:

| Debt | Maturity | Principal Amount |
|---|---|---|
| Revolver | March 24, 2020 | $300 million |
| Term Loan B-1 | March 24, 2020 | $569 million |
| Term Loan B-2 | March 24, 2022 | $480 million |
| Capital Leases | Variable | $33 million |
| | Total: | $1,382 million |

## I.     The Credit Agreement.

28.     In connection with the closing of the Merger, certain of the C&J entities executed the Credit Agreement, dated as of March 24, 2015, by and between C&J Energy, C&J Energy subsidiary CJ Lux Holdings S.à.r.l., U.S. HoldCo, the Lenders party thereto, and Cortland Capital Market Services LLC, as successor administrative agent (the "Administrative Agent"). The Credit Agreement originally provided for two senior secured credit facilities in an aggregate amount of $1.66 billion, consisting of: (a) a revolving credit facility with a maximum availability of $600 million (the "Revolver"); and (b) a term loan B credit facility in the aggregate principal amount of $1.06 billion (the "Term Loan"). The Credit Agreement contains certain financial covenants applicable to both the Revolver and Term Loan, including a Total Leverage Ratio, Interest Coverage Ratio, and Minimum Cumulative Consolidated EBITDA (each as defined in the Credit Agreement). Obligations under the Credit Agreement are guaranteed by each of the Debtors and certain of the Non-Op Entities. As is relevant here, obligations under the Credit Agreement are secured on a *pari passu*, first-lien basis by substantially all of the Debtors' assets, including cash held in controlled depository accounts.

29.     ***Revolver:*** In connection with certain amendments to, and waivers under, the Credit Agreement (described below), as of the Petition Date, the aggregate commitments under the Revolver have been limited to $300 million. As of the Petition Date, approximately $300

million remains outstanding under the Revolver, which amount includes $15.14 million in outstanding letters of credit.

30.     **_Term Loan:_**  The Term Loan is comprised of two tranches:  a tranche consisting of term loans maturing on March 24, 2020 ("Term Loan B-1") and a second tranche consisting of term loans on substantially identical terms but maturing on March 24, 2022 ("Term Loan B-2").  As of the Petition Date, approximately $569 million in principal remained outstanding under Term Loan B-1 and approximately $480 million in principal remained outstanding under Term Loan B-2, for an aggregate outstanding principal balance under the Term Loan of approximately $1.05 billion.

31.     In addition to the principal amounts outstanding under the Revolver and the Term Loan, interest and fees (including letter of credit fees and unused commitment fees) have gone unpaid and been accruing since prior to May 31, 2016, when the Debtors, the Administrative Agent, and certain of the Lenders entered into the Forbearance Agreement (as defined below).

**II.     Capital Leases.**

32.      In 2013, C&J entered into certain "build-to-suit" lease agreements for the construction of a new, technology-focused research and development facility and a new corporate office.  Each lease is accounted for as a capital lease (collectively, the "Capital Leases").  As of the Petition Date approximately $33 million remained outstanding under the Capital Leases.  Debtor C&J Energy Services, Inc. is the obligor under the Capital Leases.

## CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES

**I.     Market Decline and Industry-Specific Challenges.**

33.     As described above, the oil and gas industry is in the midst of a sharp, sustained downturn, brought on by sagging commodities prices, that has lasted for the better part of two years.   Due  to  their  direct  exposure  to  commodity  price  swings,  E&P  companies  have

experienced the most severe distress to date.  But the market malaise has not been limited to the

E&P sector.  Like E&P companies, C&J operates upstream and its success is inextricably linked

to its E&P company customer base.  Accordingly, C&J has felt the weight of the market decline

just like upstream E&P companies.  The link between C&J's success and drilling activity in the

upstream sector is vividly demonstrated by the following graphic:



34.     The trading price of C&J Energy's common shares has fallen from a post-Merger

high of approximately $18.45 to approximately $0.31 as of the close of business on July 19,

2016 (*i.e.*, the day before the Petition Date)—a decline of approximately 98 percent.  Since the

Merger closed in the early stages of the market downturn, C&J has yet to be able to fully

capitalize on many of the opportunities available due to the greater scale, enhanced offerings,

and significant operating synergies attendant to the Merger.

35.     Further, in a down market, C&J is exposed to a mix of oilfield services industry-

specific risks.  C&J's performance is heavily influenced by the drilling, completion, and

production activities of its E&P company customer base.  In response to the recent market

downturn, E&P companies have significantly pared back new drilling activity.  Rig count, a common indicator of upstream drilling activity and one that is highly correlated with C&J's asset utilization levels (and thus C&J's operating results), is down nearly 80 percent from late-2014 highs—rig counts are down nearly 40 percent just this year.  Further, because the type of services that C&J offers can be easily "started" and "stopped," oilfield services companies like C&J tend to experience a rapid decline for their services when commodities prices are low or volatile as E&P companies become less risk tolerant.  Oilfield services companies may also experience a lagging recovery when commodities prices improve since demand for their services depends in large part on how E&P companies perceive the stability and sustainability of commodities markets.

36.     Additionally, C&J operates in a highly competitive sector and faces significant risk of decreased asset utilization rates in the event of a downturn.  Many of C&J's competitors are larger, national and multi-national companies, possessing substantially greater financial resources and more diversified revenue streams than C&J, which allow them to operate at a lower cost than C&J or even operate at a loss in certain of the regions in which C&J operates.  Additionally, well completion and servicing equipment can be moved with relative ease from one region to another, which may result in an oversupply of equipment in a given geographic locale in the event that market conditions or activity levels improve.  Such movement results in downward pressure on the prices C&J is able to charge for its services, potentially sapping any benefit of incremental commodity prices improvements.

37.     Finally, certain states, including Texas—where a large portion of C&J's assets and operations are located—have statutory provisions in place that offer significant protections to entities that qualify as "mineral contractors" ("Mineral Contractors").  The term Mineral

Contractors covers a wide range of entities that provide services in connection with oil and natural gas drilling activities, and includes a number of vendors that C&J frequently transacts with on behalf of its customers—*i.e.*, C&J contracts with certain vendors that qualify as Mineral Contractors to provide ancillary services to certain of C&J's customers.  In Texas, for example, Mineral Contractors may assert a lien against the property of C&J's *customers* due to nonpayment (even if payment was due from C&J).  This threat, in light of uncertainty concerning C&J's financial condition, has caused certain of C&J's customers to seek alternative oilfield services providers—exacerbating C&J's financial difficulties.  C&J has taken steps to quell these fears, however, including negotiating for payment in full of all claims owed to its Mineral Contractors under the terms of the RSA (as described below).

38.     While E&P companies generally consider a range of factors in contracting for well completion and support services, in a weak commodities pricing environment E&P companies tend to focus more closely—even primarily—on price.  In light of C&J's competitive position and operating model, it is difficult for C&J to compete based solely on the basis of price—C&J focuses instead on differentiating itself through offering high-quality customer service and superior operating efficiency.  Although C&J has endeavored to control input costs to provide competitive pricing, as the industry downturn wore on, C&J experienced decreased utilization rates across its service lines, which, in light of the substantial debt obligations C&J incurred in connection with the Merger, strained liquidity enterprise wide.

## II.     Proactive Approach to Addressing Financial Issues.

39.     In response to tightening market conditions, during the first quarter of 2015 C&J began to scale back operations by idling, or "stacking," unproductive equipment, reducing headcount, implementing strict cost-control measures, and negotiating price reductions with certain of its suppliers.  As market conditions continued to decline post-Merger, C&J instituted

further cost-cutting and operational right-sizing measures, including stacking additional equipment, closing and consolidating duplicative facilities, and further reducing headcount—all told, C&J reduced employee headcount from a post-Merger high of nearly 10,000 employees to approximately 4,977 employees as of the Petition Date.  C&J has also scaled back capital expenditures, decreasing from $166.3 million for the year ended December 31, 2015 to a projected $60 million to $75 million for the year ending December 31, 2016.

40.     These measures, by themselves, did not prove sufficient to resolve C&J's financial issues.  Anticipating that it would not be in compliance with the Total Leverage Ratio and Interest Coverage Ratio under the Credit Agreement for the reporting period ended December 31, 2015, C&J negotiated an amendment (the "September Amendment") to the Credit Agreement, effective September 29, 2015,  that:  (a) suspended or relaxed certain covenants; (b) provided for a permanent reduction in commitments under the Revolver from $600 million to $400 million; (c) instituted a "collateral coverage" covenant that, in effect, limited availability under the Revolver to $300 million; (d) provided for an increase in the interest rate under the Revolver based on the Total Leverage Ratio; and (e) placed certain limitations on C&J's future capital expenditures.

41.     The September Amendment, too, proved insufficient to resolve C&J's financial issues.  As market conditions continued to decline over the first quarter of 2016—with oil falling to below $30 per barrel in February 2016—C&J's financial condition continued to worsen.  For the year ended December 31, 2015, C&J incurred a net loss of approximately $872.5 million and incurred a further net loss of approximately $428.4 million for the first quarter of 2016.  Despite the recent increase in commodities prices—oil has hovered near $50 per barrel in recent weeks— C&J has continued to experience low utilization rates across its service lines as E&P companies

have remained hesitant to resume drilling activities due to perceived market volatility.  Further,

certain of C&J's larger competitors have attempted to take advantage of the downturn to grow

market share by offering services below breakeven pricing. The foregoing factors, among others,

caused C&J to breach the Minimum Cumulative Consolidated EBITDA covenant contained in

the Credit Agreement, measured as of March 31, 2016.  C&J's Form 10-Q for the quarter ended

March 31, 2016 also contained language expressing "substantial doubt" regarding C&J's ability

to continue as a going concern.

42.     Recognizing the need to examine more comprehensive restructuring solutions,

C&J sought outside strategic advice.  In addition to Fried, Frank, Harris, Shriver & Jacobson

LLP, which has served as C&J's debt financing counsel since 2011, to assist with exploring

strategic alternatives, C&J engaged Kirkland & Ellis, LLP and Loeb & Loeb LLP as legal

advisors in March 2016, Evercore Group L.L.C. ("Evercore") as financial advisor in April 2016,

and AlixPartners, LLP ("AlixPartners") as restructuring advisor in June 2016.

**III.     The Restructuring Negotiations, Temporary Waiver, and Forbearance Agreement.**

43.     On May 10, 2016, C&J entered into a Temporary Limited Waiver Agreement

(the "Temporary Waiver") with the Administrative Agent, the members of the Steering

Committee (at that time), and certain other Lenders (collectively, the "Waiver Parties").  Under

the terms of the Temporary Waiver, (a) the Waiver Parties agreed that, through May 31, 2016,

they would not consider C&J's failure to comply with the Minimum Cumulative Consolidated

EBITDA covenant as of March 31, 2016 a breach of the Credit Agreement and (b) C&J agreed

(in addition to certain other undertakings) to permanently reduce the maximum borrowing

capacity under the Revolver to $300 million and otherwise continue to comply with the Credit

Agreement.

44.     While C&J actively negotiated with its key stakeholders, including Nabors, the Administrative Agent, and the Steering Committee, during the Temporary Waiver period, it was ultimately unable to reach a resolution prior to the Temporary Waiver's expiration on May 31, 2016.  Further, C&J, recognizing a need to preserve liquidity, sought a forbearance from the Lenders with respect to an interest payment of approximately $20 million due May 31, 2016 and certain other interest and fee obligations under the terms of the Credit Agreement.  On May 31, 2016, the Steering Committee and certain other of the Lenders agreed to the forbearance and C&J entered into a Forbearance Agreement (the "Forbearance Agreement") with the Administrative Agent and the requisite Lenders (the "Forbearance Parties") under which the Forbearance Parties agreed to forbear, through June 30, 2016, from exercising any remedies under the Credit Agreement due to C&J's failure to comply with the Minimum Cumulative Consolidated EBITDA covenant and make the May 31, 2016 interest payment.

45.     On June 30, 2016, C&J entered into a second forbearance agreement (the "Second Forbearance Agreement," and together with the Forbearance Agreement, the "Forbearance Agreements") with the Forbearance Parties that essentially extended the terms of the Forbearance Agreement to July 17, 2016, contingent on, among other things, entry into a restructuring support agreement by no later than July 8, 2016.

46.     C&J took advantage of the time afforded by the Temporary Waiver and the Forbearance Agreements to comprehensively explore restructuring alternatives.  C&J received and considered separate restructuring proposals from both the Steering Committee and Nabors (collectively, the "Proposals").  Each of them generally contemplated, among other things:  (a) a substantial deleveraging of C&J's balance sheet through the near total equitization of C&J's existing obligations under the Credit Agreement; and (b) a post-emergence capital infusion

through the consummation of a $150 million to $200 million equity investment (in the case of the Steering Committee proposals, structured as a backstopped rights offering). Later Nabors proposals also contemplated a truncated sale process pursuant to section 363 of the Bankruptcy Code (which the Steering Committee indicated it would not support) that would result in the sale of substantially all of C&J's assets, with Nabors acting as the stalking horse. C&J ultimately negotiated a resolution—*i.e.*, the RSA—that will result in the ***complete*** equitization of its funded-debt obligations with the support of a significant majority of the Lenders, facilitate a post-emergence rights offering at the top of the proposed range, and otherwise preserve and maximize C&J's value as a going concern on an enterprise-wide basis.

47.     In the months immediately preceding the Petition Date, the Board met on 22 separate occasions to consider the Proposals and certain ancillary matters. Further, on May 26, 2016, the Board appointed a special restructuring committee (the "Special Committee") for the purpose of exploring strategic alternatives and closely monitoring the negotiations between C&J's management team and advisors and the Administrative Agent, the Steering Committee, Nabors, and other potential third-party investors. In the two months immediately preceding the Petition Date, the Special Committee separately met on 18 occasions to consider the Proposals, authorize the terms of C&J's counterproposals to the Proposals, and other ancillary matters.

48.     On July 8, 2016, the Special Committee, after extensive analysis and discussions with C&J's management team and advisors, unanimously approved and recommended C&J's entry into the RSA to the full Board. On the same day, the Board approved C&J's entry into the RSA. Over the course of the next two weeks, the Debtors finalized preparation for these chapter 11 cases. Notably, on July 14, 2016, the Board approved a limited amendment to the RSA (including a corresponding amendment to the Second Forbearance Agreement), which, among

other things, (a) effectively allowed non-Steering Committee Lenders to participate in the Proposed DIP Financing and (b) extended the terms of the Second Forbearance through July 20, 2016. On July 20, 2016 (*i.e.*, the Petition Date), after further analysis and discussions with C&J's management team and advisors, the Special Committee recommended and the full Board ultimately approved the Debtors' chapter 11 filings and, in accordance with the first Milestone, the Debtors commenced these chapter 11 cases.

## IV.    The RSA and Proposed DIP Financing.

49.    As part of the RSA, certain of the Lenders agreed to fund the Proposed DIP Financing. The Proposed DIP Financing provides the Debtors with postpetition financing in the form of a senior secured, superpriority delayed-draw term loan credit facility in the aggregate principal amount of $100 million. The Proposed DIP Financing also contemplates consensual use of the Lenders' cash collateral. Based on my knowledge and extensive discussions with C&J's management team and advisors, I believe that the Proposed DIP Financing gives the Debtors sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases as the Debtors seek to implement the restructuring embodied in the RSA and proceed expeditiously toward a value-maximizing resolution to these chapter 11 cases. Further, the Debtors have an immediate need for debtor-in-possession financing—including the initial $25 million draw under the Proposed DIP Financing—to provide comfort to their customer and vendor constituencies. In light of the Mineral Contractor issues outlined above, the Debtors are likely to experience customer flight in the wake of their chapter 11 filing absent a clear indication of their financial wherewithal to continue to pay their vendors. Finally, based on extensive discussions with C&J's advisors, I understand that the Proposed DIP Financing is on the most favorable terms available in light of the circumstances of these chapter 11 cases and the current market for such financing.

23

50.     The RSA provides for the reorganization of the Debtors as a going concern with a completely deleveraged capital structure and sufficient liquidity to fund the Debtors' postpetition business plan.    In addition to funding the Proposed DIP Financing, under the RSA, approximately 83 percent of the Lenders, in amount, have agreed to further facilitate the Debtors' restructuring by accepting equity interest in the reorganized Debtors and participation in the Rights Offering on account of their claims, which total nearly nearly $1.4 billion.  Certain of the Lenders party to the RSA, including the members of the Steering Committee, have also agreed to backstop the full amount of the Rights Offering.  Generally, the RSA contemplates a chapter 11 plan that will provide the following recoveries to holders of claims against and interests in the Debtors:

- payment in full of all administrative and priority claims in cash at emergence;

- payment in full of all claims arising under the Proposed DIP Financing in cash at emergence;

- holders of certain Mineral Contractor claims, arising under chapter 56 of the Texas Property Code, or any similar federal, state, or local law, will receive a full recovery, to be paid in cash, or otherwise provided such treatment as to render their claims unimpaired;

- each holder of claims arising under the Credit Agreement will receive its pro rata share of (a) 100% of the Debtors' post-emergence common equity (subject to dilution) and (b) if such holder is an "Accredited Investor" (as defined under U.S. securities laws) subscription rights to participate in the Right Offering;

- treatment of general unsecured claims remains to be determined and will be set forth in the Debtors chapter 11 plan, when filed; and

- to the extent holders of C&J Energy common equity interests vote as a class to accept the chapter 11 plan contemplated by the RSA, each such holder shall receive its pro rata share of certain new seven-year warrants convertible into up to 6 percent of C&J Energy's post-emergence common stock at a strike price of $1.55 billion.

51.    Upon emergence, certain of the Lenders will backstop the $200 million Rights Offering, which capital will go to the Debtors to fund ongoing liquidity needs.

**BERMUDIAN AND CANADIAN PROCEEDINGS**

52.    The Bermudian Debtors and Canadian Debtors have already or will soon commence foreign insolvency proceedings so that C&J may effectuate an enterprise-wide restructuring and otherwise protect its foreign assets and operations.    Specifically, contemporaneously with the Debtors' commencing these chapter 11 cases, the Bermudian Debtors will commence "provisional liquidation" proceedings (the "Bermudian Proceedings") pursuant to sections 161 and 170 of the Bermuda Companies Act 1981 by presenting "winding up" petitions to the Bermudian Court.    Upon the application of the Bermudian Debtors, the Bermudian Court will appoint a "provisional liquidator."    The provisional liquidator acts as an officer of the Bermudian Court to oversee the reorganization of the Bermudian Debtors. The Bermudian Debtors will seek appointment of a provisional liquidator with "limited" powers, such that C&J's management team and the Board will remain in control of C&J's day-to-day operations and these chapter 11 cases.    After the Bermudian Court appoints a provisional liquidator, a statutory stay of proceedings in Bermuda against the Bermudian Debtors or their assets will automatically arise.    On the "return date" for the Bermudian petitions—similar to a "second day" hearing in a chapter 11 proceeding—the Bermudian Debtors will seek to postpone their petitions *sine die* (*i.e.*, without a specified return date), while the Debtors administer these chapter 11 cases.

53.    Similarly, in light of C&J's substantial Canadian assets and operations, each of the Canadian Debtors will commence proceedings (the "Canadian Proceedings") under the Companies' Creditors Arrangement Act (the "CCAA") in Canada.    The Canadian Debtors will request that the Canadian Court treat the chapter 11 cases of the Canadian Debtors as "foreign

main proceedings" under the applicable provisions of the CCAA—similar to the chapter 15 process under the Bankruptcy Code.  To commence the Canadian Proceedings, Canadian Debtor C&J Energy Production Services-Canada Ltd. ("C&J Canada") filed a motion with the Court contemporaneously herewith requesting authority to act as the Canadian Debtors' "foreign representative," as required under the CCAA.  C&J Canada will file a similar corresponding motion in the Canadian Proceedings shortly after the hearing on the First Day Motions.  As with the Bermudian Proceedings, the Canadian Proceedings will be ancillary in nature to these chapter 11 cases, which will be the focus of the Debtors' restructuring efforts.

## PROPOSED TIMELINE

54.     The RSA requires that the Debtors proceed expeditiously through chapter 11. The Lenders' support for the transactions contemplated by the RSA is contingent upon, among other things, the Debtors administering their chapter 11 cases in accordance with the Milestones, namely:

- entry of an interim order approving the Proposed DIP Financing (the "Interim DIP Order") within 7 days of the Petition Date;

- entry of a final order approving the Proposed DIP Financing within 40 days of entry of the Interim DIP Order;

- filing a chapter 11 plan of reorganization and related disclosure statement within 30 days of the Petition Date;

- entry of an order approving the sufficiency of the disclosure statement within 90 days of the Petition Date;

- entry of an order confirming the Debtors' chapter 11 plan of reorganization (the "Confirmation Order") within 130 days of the Petition Date; and

- occurrence of the plan's effective date within 21 days following the date of entry of the Confirmation Order.

55.     Failure to meet any of the Milestones may result in a termination event under the RSA and, potentially, a default or event of default under the Proposed DIP Financing.  Of course, the effects flowing from the termination of the RSA or Proposed DIP Financing would be disastrous.  The Debtors would lose the benefit of not only the concessions embodied in the RSA, but of the Rights Offering's enterprise-saving liquidity.

56.     The Debtors are poised to achieve a truly extraordinary result.  The RSA and Proposed DIP Financing represent the successful culmination of months of restructuring efforts and a significant compromise by the Lenders.  The RSA and Proposed DIP Financing also give the Debtors the best opportunity to withstand the current adverse market conditions.  Given the significant consensus among the Lenders in favor of the Plan and the challenging market backdrop, delaying Plan confirmation longer than is absolutely necessary will serve little purpose.  The restructuring contemplated by the RSA significantly deleverages the Debtors' balance sheet, provides critical liquidity to fund ongoing operations, and ultimately inures to the benefit of C&J stakeholders enterprise wide.

## RELIEF SOUGHT IN THE FIRST DAY MOTIONS

57.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions[3] seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.  I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases.  A description of the relief requested in and the facts supporting each of the First Day Motions is set forth below.

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

I.      **Emergency Motion of CJ Holding Co.,** *et al.***, for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "**<u>Joint Administration Motion</u>**").**

58.     Pursuant to the Joint Administration Motion, the Debtors request entry of an order:  (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief, including the ability to add later filed cases to these chapter 11 cases.   Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience and cost savings to C&J without harming the substantive rights of any party in interest.

59.     Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.  For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of twelve independent chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

II.     **Emergency Motion of CJ Holding Co., et al., for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief (the "**<u>DIP Motion</u>**").**

60.     Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders approving the Proposed DIP Financing.   The Debtors require immediate access to up to $25 million (the "<u>Initial Draw</u>") under the DIP Facility in addition to continued use the Prepetition Lenders' cash collateral (the "<u>Cash Collateral</u>") to avoid any further harm to their

business—already battered by the sever market conditions—and preserve value enterprise wide. As of the Petition Date, the Debtors' total cash balance was approximately $43.9 million (excluding from cash from captive insurance entities and restricted cash) and they do not have readily available sources of additional financing.  Significantly, due to the volatile nature of industry in which C&J operates (described above), C&J has historically attempted to maintain a balance of approximately $25 million in cash on hand to preserve the flexibility to react to revenue swings.  Accordingly, without additional financing, the Debtors lack sufficient funds to operate their businesses and continue paying their postpetition obligations as they come due.

61.     In light of the Debtors' constrained liquidity position, AlixPartners and Evercore commenced an evaluation of the Debtors' financing needs and funding alternatives for an in-court restructuring.  AlixPartners and Evercore worked closely with the Debtors, their management team, and their advisors to determine the Debtors' cash requirements.  While the current market conditions are challenging, the Debtors have a fundamentally strong asset base and experienced management team.  Based on my knowledge and extensive discussions with C&J's management team and advisors, I believe that time and an appropriate amount of additional funding will permit the Debtors to complete a restructuring transaction that will enable them to significantly improve their balance sheet.

62.     As part of AlixPartners' evaluation of the Debtors' liquidity position and financing needs, AlixPartners worked with the Debtors' management team and treasury personnel to develop and analyze the Debtors' cash flow forecasts, which take into account anticipated cash receipts and disbursements during the projected period, and considered a number of factors, including the effect of the chapter 11 filing on the Debtors' operations, fees and interest expenses associated with the Proposed DIP Financing, professional fees, and

required ordinary course operational expenses. Based upon these forecasts and extensive discussions with C&J's management team and advisors, I do not believe that the Debtors are able to generate sufficient levels of operating cash flow in the ordinary course of business to cover their working capital needs and the projected costs of these chapter 11 cases without debtor-in-possession financing.

63.     Accordingly, since it would not be possible to administer the Debtors' chapter 11 cases solely on a "cash collateral" basis, AlixPartners and the Debtors determined that obtaining debtor-in-possession financing at the start of these chapter 11 cases is crucial to the Debtors' continued viability. As described above, the Debtors require immediate access to the Initial Draw to provide comfort to their customer base—including those customers concerned with potential Mineral Contractor liens—and stabilize operations enterprise wide. Further, I understand that the Debtors have not discovered sufficient unencumbered assets to secure sufficient debtor-in-possession financing to fund a non-consensual chapter 11 case. Thus, I believe that approval of the Proposed DIP Financing is in the best interests of the Debtors and their stakeholders and provides the Debtors with sufficient liquidity to administer these chapter 11 cases and emerge with a completely deleveraged balance sheet.

64.     The Proposed DIP Financing provides the Debtors with approximately $100 million in new money. AlixPartners and Evercore worked closely with the Debtors' management team and other advisors to determine the appropriate amount of debtor-in-possession financing that would be necessary to satisfy the foregoing obligations. After reviewing the Debtors' projected operating cash flows and working capital requirements, AlixPartners, Evercore, and the Debtors' management team concluded that the Proposed DIP Financing along with continued access to the Lenders' cash collateral would provide enough

liquidity to facilitate the administration of these chapter 11 cases, fund all payments contemplated by the First Day Motions described herein, and position the Debtors with sufficient capital to operate their businesses upon emergence.

65.     Based on the foregoing, I believe that the amount of the Proposed DIP Financing is appropriate and justified in light of the Debtors' businesses and their liquidity needs, and will inure to the benefit of the Debtors' estates, their stakeholders, and stakeholders on an enterprise-wide basis.  Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion should be approved.

66.     Further support for the relief requested in the DIP Motion is set forth in the *Declaration of Stephen Hannan in Support of the Emergency Motion of CJ Holding Co.,* et al.*, for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* filed contemporaneously herewith.

**III.    Emergency Motion of CJ Holding Co.,** *et al.* **for Entry of an Order Authorizing C&J Energy Production Services-Canada Ltd. to Act as Foreign Representative Pursuant to 11 U.S.C. § 1505 (the "**<u>Foreign Representative Motion</u>**").**

67.     Pursuant to the Foreign Representative Motion, the Debtors seek entry of an order authorizing Debtor C&J Canada to act as the Foreign Representative on behalf of the Canadian Debtors' estates in the Canadian Proceedings, as described above.

68.     Debtors C&J Canada and Mobile Data Technologies Ltd. are corporations registered in Alberta, Canada.  C&J Canada, as the proposed Foreign Representative, will shortly seek ancillary relief in the Canadian Court on behalf of the Canadian Debtors pursuant to the CCAA.  The purpose of the Canadian Proceeding is to request that the Canadian Court recognize

31

the Canadian Debtors' chapter 11 cases as "foreign main proceedings" under the applicable provisions of the CCAA to, among other things, protect C&J's assets and operations in Canada. To commence the Canadian Proceedings, C&J Canada requires authority to act as the "foreign representative" on behalf of the Canadian Debtors.  Therefore, C&J Canada requests authority to act as the Foreign Representative.

69.     To commence the Canadian Proceeding, C&J Canada requires authority to act as the "foreign representative" on behalf of the Canadian Debtors' estates.  Authorizing C&J Canada to act as the Foreign Representative on behalf of the Canadian Debtors in the Canadian Proceeding will allow for coordination between these chapter 11 cases and the Canadian Proceedings, and provide an effective mechanism to protect and maximize the value of the Debtors' estates.

70.     Based on my knowledge and extensive discussions with C&J's management team and advisors, I believe that the relief requested in the Foreign Representative Motion is necessary and appropriate and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of C&J Canada, I respectfully submit the Foreign Representative Motion should be approved.

**IV.     Emergency Motion of CJ Holding Co.,** *et al.*, **for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System and Maintain Existing Bank Accounts and (B) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief (the "<u>Cash Management Motion</u>").**

71.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to:  (a) continue to operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto; and (b) continue to perform intercompany transactions consistent with historical practice, as modified as set forth in the Cash Management Motion.

72.     In the ordinary course of business, the Debtors maintain an integrated, centralized cash management system.  The Cash Management System is comparable to the centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner.   The Debtors use the Cash Management System in the ordinary course of their businesses to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting. The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions (as defined below).  The Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

73.     The Cash Management System comprises a total of 117 active bank accounts, each as described in more detail in the Cash Management Motion.   As of the Petition Date, the Debtors had approximately $43.9 million in cash on hand.   The Debtors pay their Cash Management Banks approximately $50,000 per month in the aggregate on account of fees incurred in connection with the Bank Accounts.  The Debtors estimate that they owe their Cash Management Banks approximately $50,000 as of the Petition Date, the entirety of which will become due and payable within the interim period.

74.     As part of the Cash Management System, the Debtors maintain their excess cash in conservative investments that satisfy certain prudent investment guidelines.  I understand that such investments permit the Debtors to balance their need to access liquidity on a daily basis with protections that are substantially similar to those contemplated by section 345(b) of the Bankruptcy Code.  Requiring the Debtors to bond these accounts, as required by section 345(b) of the Bankruptcy Code, would impose considerable costs to the Debtors' estates.

75.     Further, the banks where the Debtors hold accounts:  (a) have executed a Uniform Depository Agreement with, and are designated as authorized depositories by, the U.S. Trustee pursuant to the U.S. Trustee Operating Guidelines; (b) are insured by federal agencies, such as the Federal Deposit Insurance Corporation; or (c) are otherwise well-capitalized and financially stable financial institutions.  Requiring the Debtors to transfer any of the above-mentioned Bank Accounts to a designated authorized depository would place a needless administrative burden on the Debtors and impose significant costs to the Debtors' estates.

76.     Further, as part of the Cash Management System, the Debtors utilize numerous preprinted business forms in the ordinary course of their business. The Debtors also maintain books and records to document, among other things, their profits and expenses. Allowing the continued use of all correspondence and Business Forms (including, without limitation, letterhead, purchase orders, invoices, as well as preprinted and future checks) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, would minimize administrative expense and avoid confusion on the part of customers, vendors, and suppliers during the pendency of these chapter 11 cases.

77.     Finally, in connection with the ordinary course operations of the Cash Management System, the Debtors maintain business relationships with each other and their non-Debtor affiliates in the ordinary course of business that result in intercompany receivables and payables among the Debtors.  The Debtors also maintain relationships with their foreign Debtor and non-Debtor affiliates that may result in the transfer of cash between one another.  At a high level, the Intercompany System used for tracking Intercompany Claims among the Debtors can be divided into three primary components:  (a) tracking and reconciling third party receivables;

34

(b) tracking and reconciling third party disbursements; and (c) tracking and allocating general and administrative expenses.

78.     The Intercompany System is an essential aspect of the Debtors' complex operations.  The Intercompany Transactions are crucial for the Debtors to process payroll, pay vendors for goods and services, and to otherwise operate their businesses.  The Debtors would be unduly burdened both financially and logistically if they were required to halt the Intercompany Transactions at this time or otherwise make material changes to the Intercompany System.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.

79.     I believe that the relief requested in the Cash Management Motion is essential to the continued operation of the Debtors' business and denial of such relief would severely disrupt, if not cripple, the Debtors' business.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**V.      Emergency Motion of CJ Holding Co.,** *et al.***, for Entry of Interim and Final Orders Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs (the "Wages Motion").**

80.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to: (a) pay certain prepetition wages, salaries, reimbursable employee expenses, and other compensation described below; (b) pay and honor employee medical and similar benefits; (c) continue employee compensation and employee benefit

programs in the ordinary course of business on a postpetition basis in a manner consistent with prepetition practices; and (d) continue employee incentive programs for non-insiders.

81.     The Debtors employ approximately 4,977 individuals.    Approximately 3,464 Employees are paid on an hourly basis and approximately 1,513 of the Employees are salaried. Additionally, approximately 319 of the Employees are located in Canada and employed by Debtors Mobile Data Technologies Ltd. or C&J Canada, while the remaining 4,658 Employees are located in the United States and employed by the various domestic Debtors.    None of the Employees are represented by a union or collective bargaining unit.    The Employees perform a wide variety of functions critical to the administration of these chapter 11 cases, the Debtors' restructuring, and C&J's ability to continue as a going concern.    Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.    In many instances, the Employees include highly trained personnel who are not easily replaced.    Without the continued, uninterrupted services of the Employees, the Debtors' business and restructuring efforts will be halted.

82.     The vast majority of the Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.    Thus, employees will be exposed to significant financial hardships if the Debtors are not permitted to continue paying their compensation, providing benefits, and maintaining existing programs.    Consequently, I believe that the relief requested is necessary and appropriate.

83.     The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected.    The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Employee Compensation and Benefits, including, among other things, wages, salaries, and other compensation; expense reimbursement,

including, purchase and fuel card programs, tuition reimbursement, and relocation expenses; payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions); health insurance, including, medical, dental, vision, and disability, retirement benefits, workers' compensation benefits, paid time off, other paid leave, unpaid leave, life and accidental death and dismemberment insurance, short- and long-term disability coverage, employee assistance, severance, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business and as further described in the Wages Motion.

84.     Pursuant to the Wages Motion, the Debtors also seek authority to continue their ordinary course incentive programs and to honor their obligations to non-insider Employees under the pre-existing bonus programs, described more fully in the Wages Motion.  The Debtors believe the Employee Incentive Programs drive Employees' performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency and safety of the Debtors' operations.  I understand that "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code) of the Debtors are excluded from the relief requested in the Wages Motion.

85.     I believe that the Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience significant employee turnover and instability at this critical time in these chapter 11 cases.  Additionally, I understand that a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant cost and efforts—which efforts may not be successful given the overhang of these chapter 11 cases.  I therefore believe that payment of certain prepetition obligations with respect to the Employee Compensation and Benefits is a

necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of the Employees as the Debtors seek to operate their business in these chapter 11 cases.  Therefore, I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

VI.    **Emergency Motion of CJ Holding Co.,** *et al.***, for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Claims on Account of Mineral Contractor Liens that May Be Filed Against the Debtors' Customers, (B) Shipping Claims, (C) 503(b)(9) Claims, and (D) Donation Deposits; (II) Confirming Administrative Expense Priority of Outstanding Orders; and (III) Granting Related Relief (the "**<u>Lienholders Motion</u>**").**

86.    Pursuant to the Lienholders Motion, the Debtors seek entry of interim and final orders:  (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business all undisputed, liquidated, prepetition amounts owing on account of (i) Mineral Contractor Claims, (ii) Shipping Claims, (iii) 503(b)(9) Claims, and (iv) Donation Deposits; (b) confirming the administrative expense priority status of Outstanding Orders and authorizing payment of such obligations in the ordinary course of business.

87.    ***Mineral Contractor Claims:***  In the ordinary course of business, the Debtors engage certain independent contractors and service providers as subcontractors for many of the essential materials and services the Debtors depend on to service their customer base.  Specifically, the Debtors require these subcontractors to perform labor or supply materials, services, and machinery essential to the Debtors' operations, often on a project basis without long-term contracts.  The Debtors believe that it is likely that they owe the Mineral Contractors certain amounts for prepetition goods and services provided to the Debtors in the ordinary course of business.

88.     In the 12 months preceding the Petition Date, the Debtors paid approximately $340 million in Mineral Contractor Claims.  As of the Petition Date, the Debtors estimate that they have approximately $17.0 million prepetition Mineral Contractor Claims outstanding, of which up to $5.5 million may come due on an interim basis. If the Debtors were to default on any obligation to one of its Mineral Contractors, that Mineral Contractor may likely assert a lien against the property of a customer of Debtors' whose property the Debtors and the Mineral Contractor serviced.   That customer may in turn, withhold payment to the Debtors in the amount claimed by the Mineral Contractor, or worse, walk away from the Debtors as a customer entirely. Thus, failure to pay Mineral Contractor Claims would severely disrupt the Debtors' operations if not bring operations to a screeching halt—thus potentially costing the Debtors a substantial amount of revenue and future business.

89.     ***Shipping Claims:***  In the ordinary course of business, the Debtors engage certain third-party shippers to store and transport the Debtors' inventory or materials.  The Shippers regularly possess Materials belonging to the Debtors as well as the Debtors' customers.  The Materials are integral to the Debtors' business operations.  The Debtors believe that it is likely that they owe the Shippers certain amounts for prepetition shipping services provided to the Debtors in the ordinary course of business.  If the Debtors were to default on any obligation to the Shippers they may assert a lien, attempt to take possession of the Debtors' property, and/or bar the Debtors' access to Materials necessary to the operations of the Debtors' businesses. In addition:  (a) under most states' laws, a Shipper may have a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods; and (b) pursuant to section 363(e) of the Bankruptcy Code, the Shippers, as bailees, may be entitled to adequate protection for any valid possessory lien.

90.     In the twelve months preceding the Petition Date, the Debtors paid approximately $32 million in Shipping Claims.  As of the Petition Date, the Debtors estimate that they have approximately $2.5 million of prepetition Shipping Claims outstanding.  The refusal of Shippers to deliver or return the Debtors' goods and raw materials as a result of not being paid would severely disrupt the Debtors' operations and potentially cost the Debtors a substantial amount of revenue and future business.

91.     ***503(b)(9) Claims:***  The Debtors may have received certain goods or materials from various vendors within the 20 days before the Petition Date.  The Debtors believe that as of the Petition Date, they owe approximately $8.5 million on account of goods delivered within the 20 days prior to the Petition Date, the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.  Each of the 503(b)(9) Claimants provide materials that are necessary for the Debtors' business operations.  The Debtors believe a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims or reduce the Debtors' existing trade credit—or demand payment in cash on delivery—further exacerbating the Debtors' financial constraints.

92.     ***Donation Deposits Held in Trust:***  Before the Petition Date and on an ongoing basis, the Debtors are in the process of soliciting and collecting donations for a charity event sponsored by Debtor Total E&S, Inc. in favor of the Boys and Girls Club of Granbury, Texas, and to pay and satisfy the costs and expenses due and owing to vendors associated therewith out of the proceeds.  In 2015, pursuant to its charitable arrangement with the B&G Club, Total E&S collected approximately $100,000 from donors on account of the Charity Event, which were for a period deposited in certain of its operating accounts.  The Debtors expect to hold the Charity Event on August 12, 2016.  As of the Petition Date, the Debtors have received approximately

40

$5,000 in donations, which are currently deposited together with other operating funds of Total E&S.

93.     ***Outstanding Orders:***  Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date.  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, the Debtors believe certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  The Debtors estimate that approximately $8.5 million is on account of Outstanding Orders as of the Petition Date.

94.     The Debtors submit that the relief requested in the Lienholders Motion will allow the Debtors to preserve stakeholder value and avoid business interruption by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise and which, I understand, would be entitled to payment in full under a chapter 11 plan as secured or priority creditors in any event.  The Debtors estimate that the harm attendant to failing to pay the above-described claims in the regular course of business would likely far outweigh the cost of such payment.  Therefore, I believe that the relief requested in the Lienholders Motion inures to the benefit of all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Lienholders Motion.

**VII.   Emergency Motion of CJ Holding Co.,** *et al.***, for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and Foreign Vendors (the "<u>Critical Vendors Motion</u>").**

95.     Pursuant to the Critical Vendors Motion, the Debtors seek entry of interim and final orders:  (a) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, all undisputed, liquidated, prepetition amounts owing on account of claims held by critical foreign vendors, service providers, and utilities located outside the United States, that are

essential to the Debtors' ongoing business operations, and (b) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, all undisputed, liquidated, prepetition amounts owing on account of claims held by Critical Vendors that are essential to the Debtors' ongoing business operation.

96.     In the ordinary course of business, the Debtors engage a limited number of providers for many of the critical materials and services the Debtors depend upon to service their customers.  Of particular importance are vendors irreplaceable due to geography, customer mandated suppliers, specialized equipment providers, and technical service expertise specific to the Debtors' operations, equipment, and infrastructure.  The Debtors obtain such materials and services from a limited number of highly specialized vendors, service providers, and other businesses that would likely be impossible to replace or the loss of which would result in substantially higher costs for the Debtors at this early, critical juncture in these chapter 11 cases. The Debtors rely on timely and frequent delivery of these critical goods and services and any interruption in this supply—however brief—would disrupt the Debtors' operations and could potentially cause irreparable harm to their businesses, goodwill, employees, customer base, and market share.  Further, the Debtors currently enjoy favorable trade terms with many of their Critical Vendors.  Loss of trade terms (whether on account of demands for cash in advance, cash on delivery, or otherwise) would materially impair the value of the Debtors' estates.

97.     With the assistance of their advisors, the Debtors have spent time reviewing and analyzing their books and records, consulting with management and the Debtors' personnel responsible for operations and purchasing, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice to identify certain critical business relationships and/or suppliers of goods and services—the loss of which would materially impair

the going-concern viability of the Debtors' business.  At this time, the Debtors estimate that the Critical Vendors may hold claims in excess of $4.0 million that are not entitled to administrative or other priority status under section 503(b)(9) of the Bankruptcy Code, of which approximately $2.0 million may come due on an interim basis.

98.     Further, as a result of the global nature of their operations, the Debtors regularly transact business with entities located outside of the United States.  Many of these Foreign Vendors supply goods, materials, or services to the Debtors that are crucial to the Debtors' ongoing operations.  Based on the reactions of foreign suppliers in other chapter 11 cases, the Debtors believe there is a significant risk that nonpayment could cause a Foreign Vendor to stop shipping goods to the Debtors on a timely basis or to sever completely its business relationship with the Debtors.  Further, if the Foreign Vendor Claims are not paid, the Foreign Vendors may take precipitous action against the Debtors based upon an erroneous belief that they are not subject to the automatic stay provisions of section 362(a) of the Bankruptcy Code.  Foreign Vendors could, among other things, initiate a lawsuit in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them or seek to attach or seize foreign assets of the Debtors or their non-Debtor affiliates even prior to obtaining a judgment.

99.     More fundamentally, the Foreign Vendors could simply refuse to do business with the Debtors.  Because all of the Foreign Vendors have no (or *de minimis*) assets or operations in the United States that would be subject to the jurisdiction of this Court, the Debtors have no workable enforcement mechanism against these parties.  The cumulative impact of the Foreign Vendors' breach of their contracts with the Debtors could have an adverse effect on the Debtors' operations and their ability to reorganize.  In light of these consequences, the Debtors have concluded that payment of the Foreign Vendor Claims is essential to avoid disruptions to the

Debtors' operations.    The Debtors estimate that as of the Petition Date, approximately $6.0 million is accrued and outstanding on account of Foreign Vendor Claims, constituting approximately 8.4% of the amount of the Debtors' unsecured claims presently estimated to total $71.5 million, of which approximately $600,000 of which may come due on an interim basis.

100.    The Debtors submit that the relief requested in the Critical Vendor Motion will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise while also providing the Debtors with flexibility to engage in settlement discussions with such parties regarding the validity, amount, and extent of their claims.    The Debtors estimate that the harm attendant to severing ties with the Critical Vendors or Foreign Vendors would likely far outweigh the cost of payment of the Critical Vendor Claims and Foreign Vendor Claims.    Therefore, I believe that the relief requested in the Critical Vendors Motion inures to the benefit of all parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Critical Vendors Motion.

**VIII.    Emergency Motion of CJ Holding Co., _et al._, for Entry of an Order Authorizing the Debtors to File Under Seal Certain Confidential Information Attached to their Critical Vendor Motion (the "<u>Critical Vendor Seal Motion</u>").**

101.    Pursuant to the Critical Vendor Seal Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to file under seal the Confidential Information contained in the Critical Vendor Motion; and (b) directing that the Confidential Information shall remain under seal and confidential and not be made available to anyone, without the consent of the Debtors, except to (i) the Court and (ii) the U.S. Trustee on a confidential basis.

102.    In the Critical Vendor Motion, the Debtors reference a list of critical vendors, the nature of goods and services they provide to the Debtors, the amounts scheduled for payment to the critical vendors, and certain other additional confidential information in connection with the

Debtors' request for authority to pay certain prepetition claims of Critical Vendors. Publicly disclosing this Confidential Information would materially harm the Debtors' ability to negotiate critical vendor payment amounts with the potential Critical Vendors. At the same time, the Debtors believe the Confidential Information will assist the Court's review of the arguments in support of the relief requested by Critical Vendor Motion, in compliance with Local Bankruptcy Rules, on an interim and final basis. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Critical Vendors Seal Motion.

**IX.    Emergency Motion of CJ Holding Co., *et al.*, for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock (the "<u>Equity Trading Motion</u>").**

103.    Pursuant to the Equity Trading Motion, the Debtors seek entry of interim and final orders: (a) approving certain notification and hearing procedures related to certain transfers of Common Stock; and (b) directing that any purchase, sale, or other transfer of Common Stock in violation of the procedures shall be null and void *ab initio*.

104.    The Debtors believe that, as of December 31, 2015, they had NOLs in the amount of approximately $134.1 million. The Debtors estimate that, through June 30, 2016, they have generated additional NOLs in the amount of approximately $141.2 million, for a total of approximately $275.3 million in NOLs. I understand that these NOLs and other Tax Attributes provide the potential for material future tax savings or other tax structuring possibilities in these chapter 11 cases. I further understand that these Tax Attributes are of significant value to the Debtors and their estates because the Debtors can carry forward the Tax Attributes to offset their future taxable income for up to 20 years, thereby reducing their future aggregate tax obligations. In addition, such Tax Attributes may be utilized by the Debtors to offset any taxable income

generated by transactions consummated during these chapter 11 cases.  The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

105.    To maximize the use of the Tax Attributes and enhance recoveries for the Debtors' stakeholders, the Debtors seek limited relief that will enable them to closely monitor certain transfers of Common Stock so as to be in a position to act expeditiously to prevent such transfers, if necessary, with the purpose of preserving the Tax Attributes.  I understand that sections 382 and 383 of the IRC limit the amount of taxable income that can be offset by a corporation's NOLs and certain other Tax Attributes in taxable years (or portions thereof) following an "ownership change."  The Procedures are the mechanism by which the Debtors propose that they will monitor, and, if necessary, object to, certain transfers of Common Stock and declarations of worthlessness with respect to the Common Stock to prevent an ownership change.  Notably, the relief requested in the Equity Trading Motion will affect only holders of the equivalent of 4.5 percent or more of outstanding Common Stock, and also parties who are interested in purchasing sufficient Common Stock to result in such party becoming a holder of 4.5 percent or more of outstanding Common Stock.

106.    I believe that the loss of the Tax Attributes could lead to negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process.  Accordingly, on behalf of the Debtors, I respectfully submit the Court should grant the Equity Trading Motion.

**X.      Emergency Motion of CJ Holding Co.,** *et al.***, for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests (the "Utilities Motion").**

107.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders:  (a) approving the Debtors' Proposed Adequate Assurance of payment for future utility

46

services; (b) prohibiting Utility Companies from altering, refusing, or discontinuing services; and (c) approving the Debtors' proposed procedures for resolving Additional Assurance Requests.

108.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, propane, telecommunications, water, waste management (including sewer and trash), internet, cable, and other similar services from a number of third-party utility companies or brokers.  Historically, the Debtors have paid as much as $1.5 million per month for third-party Utility Services.  On average, the Debtors pay approximately $1,374,000 each month for third-party Utility Services, calculated as a historical average payment for the six-month period that ended in June 2016.  Accordingly, the Debtors estimate that their cost for Utility Services during the next 30 days (not including any deposits to be paid) will be approximately $1,374,000.  To provide additional assurance of payment, the Debtors propose to deposit into a segregated account the $687,340 Adequate Assurance Deposit, which represents an amount equal to approximately one half of the Debtors' average monthly cost of Utility Services, calculated based on the Debtors' average utility expenses over the six months ended in June 2016.  The Adequate Assurance Deposit will be held in the segregated account at Bank of America, N.A. for the benefit of the Utility Companies and for the duration of these chapter 11 cases and may be applied to any postpetition defaults in payment to the Utility Companies.

109.    Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Indeed, any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue its operations.  I believe this disruption would adversely impact customer relationships and result in a significant decline in the Debtors' revenues and profits.  Such a

result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. It is critical, therefore, that Utility Services continue uninterrupted during these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

**XI.** **Emergency Motion of CJ Holding Co., et al., for Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto; (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; (III) Honor the Terms of the Premium Financing Agreement and Pay Premiums Thereunder; (IV) Modify the Automatic Stay with Respect to the Workers' Compensation Program; and (V) Continue the Surety Bond Program (the "Insurance and Surety Motion").**

110. Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to: (a) continue existing insurance coverage entered into prepetition and satisfy payment obligations related thereto, including any amounts owed to MS&W and Lockton (as defined herein); (b) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business; (c) honor the terms of the Premium Financing Agreement (as defined herein); (d) modify the automatic stay with respect to the Debtors' workers' compensation program; and (e) continue and renew their surety bond program on an uninterrupted basis.

111. In the ordinary course of business, the Debtors maintain approximately 34 insurance policies that are administered by various third-party insurance carriers. These policies provide coverage for, among other things, the Debtors' property, general liability, automobile liability, workers' compensation, pollution liability, umbrella coverage, excess liability, commercial and special crime, fiduciary liability, and directors and officers liability. Some, but not all, of the Insurance Policies are financed through the Premium Financing Agreement. As of the Petition Date, there is approximately $2,851,000 outstanding on account of the Premium Financing Agreement, some or all of which will come due during the pendency

48

of these chapter 11 cases.  With respect to the Insurance Policies not covered by the Premium Financing Agreement, including any amounts owed on account of the Canadian operations, the Debtors generally prepay the entire annual premium on or around the start date of each policy period.  The Debtors estimate that, as of the Petition Date, there is approximately $67,000 accrued and owing on account of the Non-Financed Insurance Policies.

112.    As set forth above, the Debtors maintain the Workers' Compensation Program for employees at the levels required by laws in the states in which the Debtors operate.  For employees outside of Ohio, Wyoming, and North Dakota, the Debtors maintain the Workers' Compensation Program through Liberty.  The Debtors finance the premium for the Workers' Compensation Program through the Premium Financing Agreement.  Coverage for Ohio, Wyoming, and North Dakota-based employees is maintained through the applicable state-administered workers' compensation program, for which the Debtors pay quarterly fees.  The Debtors estimate that, as of the Petition Date, there is approximately $233,000 outstanding in such fees, some or all of which will become due and owing during the pendency of these chapter 11 cases.  There are approximately 74 outstanding and open workers' compensation claims totaling approximately $3,000,000 and 57 outstanding and open automotive claims totaling approximately $2,000,000 as of the Petition Date (including amounts covered by the Debtors' insurance), some or all of which will become due and owing during these chapter 11 cases.

113.    The Debtors obtain the majority of its Insurance Policies through their insurance broker, McGriff, Seibels & Williams, Inc.   As of the Petition Date, the Debtors do not believe that they owe any amounts to MS&W on account of fees or any other prepetition obligations.  Lockton Companies, Inc. is the broker of record with respect to the Debtors' fiduciary, commercial and special crime, and directors' and officers' insurance policies.  As of the Petition

Date, the Debtors do not believe that they owe any amounts to Lockton on account of fees or any other prepetition obligations. Finally, BFL Canada Insurance Services, Inc. is the broker of record with respect to the Debtors' Canadian insurance policies. As of the Petition Date, the Debtors do not believe that they owe any amounts to BFL on account of fees or any other prepetition obligations. Out of an abundance of caution, however, the Debtors seek authority to honor any amounts owed to MS&W, Lockton, and BFL to ensure uninterrupted coverage.

114.    In the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties, often governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations. These obligations include, among others, reclamation, environmental obligations, tax obligations, and road damage obligations. In accordance with these state law obligations, as of the Petition Date, the Debtors have approximately 56 surety bonds outstanding totaling $6,601,761.40 outstanding. The annual premiums for the Debtors' bonds total approximately $78,387.00. The Debtors' outstanding surety bonds were issued by Liberty, the counterparty to the Debtors' Surety Indemnity Agreement. The Surety Indemnity Agreement requires a pledge of collateral in the amount of $2,500,000 and allows Liberty Mutual to request additional collateral security from the Debtors from time to time. On average, the Debtors pay approximately $12,000 to Lockton on an annual basis for fees associated with the Surety Bond Program.

115.    Continuation and renewal of the Insurance Policies and Surety Bond Program is essential to preserving the value of the Debtors' business, properties, and assets. Moreover, in many cases, coverage provided by the Insurance Policies and Surety Bond Program is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the U.S. Trustee. I believe that the relief requested in the Insurance and

Surety Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Insurance and Surety Motion.

## XII.   Emergency Motion of CJ Holding Co., *et al.*, for Entry of an Order Authorizing the Payment of Certain Prepetition Taxes and Fees (the "<u>Taxes Motion</u>").

116.    Pursuant to the Taxes Motion the Debtors seek entry of an order authorizing, but not directing, the Debtors to remit and pay Taxes and Fees that accrued before the Petition Date and will become payable during the pendency of these cases in an aggregate amount not to exceed $11,520,000.  In the ordinary course of business, the Debtors collect, withhold, and incur Taxes and Fees.  The Debtors estimate that approximately $11,520,000 in Taxes and Fees relating to the prepetition period will become due and owing to the Authorities after the Petition Date.  Payment of the Taxes and Fees is critical to the Debtors' continued and uninterrupted operations.  The Debtors' failure to pay prepetition Taxes and Fees may cause the Authorities to take precipitous action, including, but not limited to, conducting audits, filing liens, preventing the Debtors from doing business in certain jurisdictions, seeking to lift the automatic stay, or pursuing payment of the Taxes and Fees from the Debtors' officers and directors, all of which would greatly disrupt the Debtors' operations and ability to focus on their reorganization efforts.

117.    I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Taxes Motion.

## XIII.  Emergency Motion of CJ Holding Co., *et al.*, for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Waiving the Requirements to File a List of

**and Provide Notices Directly to Equity Security Holders (the "Schedules and Statements Extension Motion").**

118.    Pursuant to the Schedules and Statements Extension Motion, the Debtors seek entry of an order:  (a) extending the deadline by which the debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 30 days, for a total of 44 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown; and (b) waiving the requirements to file a list of and provide notice directly to C&J Energy's equity security holders.

119.    To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to creditor claims, as well as the Debtors' many assets and contracts.  This information is voluminous and located in numerous places throughout the Debtors' organization.   Collecting the necessary information requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term, when these resources would be best used to improve the Debtors' business operations.

120.    Although the Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules and Statements, resources are strained.   Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial postpetition period, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period.

121.    Prior to the filing of these cases, the Debtors focused on preparing for the chapter 11 filing, preparing the business to transition into chapter 11, and negotiating with their significant creditor constituencies.  Such efforts made it difficult for the Debtors to prepare the Schedules and Statements.  Although the Debtors have commenced the process that will enable them to prepare and finalize what will be voluminous Schedules and Statements, the Debtors anticipate that they may require at least 30 additional days to complete the Schedules and Statements.  The Debtors therefore request that the Court extend the 14-day period for an additional 30 days, without prejudice to the Debtors' right to request further extensions, for cause shown.

122.    In addition, an extended period for filing the Schedules and Statements will allow time for the Debtors to receive a greater number of invoices related to the prepetition period, which will improve the accuracy of the Schedules and Statements and reduce the time spent on claims administration in these chapter 11 cases.

123.    On behalf of the Debtors, I submit that the extensive amount of information that must be assembled and compiled, the multiple places where the information is located, the hundreds of employee and professional hours required to complete the Schedules and Statements, and the benefits from extending the Schedules and Statements filing deadline constitute good and sufficient cause for granting the requested extension of time.

## XIV.   Emergency Motion of CJ Holding Co., *et al.*, for (I) Appointment of Donlin, Recano & Company, Inc. as Noticing and Balloting Agent, and (II) Granting Related Relief (the "Noticing and Balloting Agent Application").

124.    Pursuant to the Noticing and Balloting Agent Application, the Debtors seek entry of an order appointing Donlin, Recano & Company, Inc. as Noticing and Balloting Agent in the Debtors' chapter 11 cases effective *nunc pro tunc* to the Petition Date to, among other tasks, (a) serve as the noticing agent to mail notices to the estates' creditors, equity security holders,

and parties in interest, (b) provide computerized objection, soliciting, and balloting database services, and (c) provide expertise, consultation, and assistance in processing and other administrative services with respect to the Debtors' bankruptcy cases, pursuant to the provisions of the Engagement Agreement.

125.    Based on my discussions with C&J's advisors, I believe that the Debtors' selection of DRC to act as the Noticing and Balloting Agent is appropriate under the circumstances and in the best interest of the estates.  Moreover, it is my understanding that based on all engagement proposals obtained and reviewed, that DRC's rates are competitive and reasonable given DRC's quality of services and expertise.

126.    The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a noticing and balloting agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing, and soliciting and balloting votes and is in the best interests of both the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Noticing and Balloting Agent Application.

**XV.    Emergency Motion of CJ Holding Co., et al., for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information For Individual Creditors, and (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information (the "Matrix Motion").**

127.    Pursuant to the Matrix Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to file a consolidated creditor matrix and list of the 30 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor,

54

(b) authorizing the Debtors to redact certain personal identification information for individual creditors, and (c) approving the form and manner of notice of commencement of these chapter 11 cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

128.    Although the list of creditors usually is filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix.  Here, the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, administratively burdensome, and of little incremental benefit.  Further, because a large number of creditors may be shared amongst the Debtors, the Debtors request authority to file a single, consolidated list of their 30 largest general unsecured creditors.  The Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.  Finally, the Debtors respectfully submit that cause exists to authorize the Debtors to redact address information of individual creditors—many of whom are the Debtors' employees—and interest holders from the Creditor Matrix because such information could be used to perpetrate identity theft.

129.    Additionally, through the Debtors' noticing and balloting agent, the Debtors propose to serve the Notice of Commencement, on all parties entitled to notice of commencement of the Cases to advise them of the meeting of creditors under section 341 of the Bankruptcy Code.  Service of the single Notice of Commencement will not only avoid confusion among creditors, but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Matrix Motion.

**XVI.  Emergency Motion of CJ Holding Co., *et al.*, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9007 Seeking Authority to Implement Certain Notice Procedures (the "<u>Notice Procedures Motion</u>").**

130.    The Debtors seek entry of an order, implementing certain notice procedures, as set forth in this Motion.  The Debtors request that, to the extent that any of the Notice Procedures conflict with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules for the Southern District of Texas, the *Uniform Texas Rules for Complex Chapter 11 Bankruptcy Cases,* the *U.S. Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Bankruptcy Cases*, and any order regarding procedures for complex chapter 11 cases, the Notice Procedures shall govern and supersede such provisions and rules.

131.    The Debtors have identified thousands parties in interest—exclusive of holders of the Debtors' publicly held equity securities—to whom notice must be given under the Bankruptcy Code, the Bankruptcy Rules and/or the Bankruptcy Local Rules.  Such notice would be extremely burdensome to the Debtors, costly to their estates and, in many instances, unnecessary, as many matters have no bearing on certain parties.  The proposed Notice Procedures will afford due and adequate notice to all parties in interest without burdening the Debtors' estates with substantial administrative costs.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Notice Procedures Motion.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  July 20, 2016                         Respectfully submitted,

                                              _/s/ Mark Cashiola_____
                                              Mark Cashiola
                                              Chief Financial Officer
                                              C&J Energy Services Ltd.